E–Z SEW ENTERPRISES, INC.,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 23716.

United States District Court
E. D. Michigan, S. D.

April 14, 1966.

Donald Anderson, Dept. of Justice, Washington, D. C., Robert F. Ritzenhein, Asst. U. S. Atty., Detroit, Mich., for the Government.

Phillip Nusholtz, Detroit, Mich., for plaintiff.

## OPINION

TALBOT SMITH, District Judge.

The plaintiff timely filed a federal income tax return for the year 1955 and paid the tax shown due on its return in the amount of $108,131.29. In determining its taxable income on that return the plaintiff deducted as "Royalty on Machines" a payment in the amount of $55,872.18 to S and G Manufacturing Company, Inc. Upon an audit of that return, the Commissioner of Internal Revenue determined that $40,872.18 of the deduction claimed by the plaintiff did not constitute an allowable deduction under Section 162(a) or any other section of the Internal Revenue Code of 1954. The Commissioner also determined that the plaintiff had been availed of in 1955 for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being divided or distributed. As a result of his determination the amount of $60,889.94 and interest on such tax in the amount of $22,415.00 was assessed as additional income tax and accumulated earnings tax under Section 531 of the Internal Revenue Code. In determining plaintiff's accumulated taxable income for 1955 under Section 535, for the purpose of computing the accumulated earnings tax, the Commissioner did not reduce the plaintiff's taxable income by any amount, as an accumulated earnings credit, because he determined that no part of its earnings and profits for 1955 were retained for the reasonable needs of its business, and that its accumulated earnings and profits at the close of the preceding taxable year exceeded $60,000.00.[1] The

---

1. Section 531 of the Internal Revenue Code of 1954 imposes the accumulated earnings tax on the corporation's "accumulated taxable income" for the taxable year. Section 535(a) defines *accumulated taxable income* as "the taxable income * * * minus * * * the accumulated earnings credit."
Section 535(c) provided for 1955 that the *accumulated earnings credit* is "an

amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business," except that the credit "shall in no case be less than the amount by which $60,000 exceeds the accumulated earnings and profits of the corporation at the close of the *preceding* taxable year." If the stock dividends distributed by the plaintiff to its shareholders in 1953 ($80,-

plaintiff paid the assessment in May of 1962 and in October filed a claim for refund in the amount of $83,304.94. Plaintiff filed this action to recover such taxes in 1963.

Five issues were presented to the Court: (Pre Trial Order)

1) Of the payment by plaintiff in 1955 to S & G Manufacturing, of $55,-872.18, what amount, if any, constituted "rentals or other payments required to be made as a condition to the continued use or possession of machinery" or "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business"?

2) Was the plaintiff "availed of for the purpose of avoiding the income tax with respect to its shareholders"?

3) What were—with respect to the accumulation of earnings and profits —the "reasonable needs of plaintiff's business" including its "reasonably anticipated needs of the business"?

4) What part, if any, of plaintiff's earnings and profits for 1955 were retained for the "reasonable needs of the business" including the "reasonably anticipated needs of the business"?

5) Whether the plaintiff's earnings and profits for the purposes of Section 533(a) and its "accumulated earnings and profits" for the purpose of Sec. 535(c) (2) included the amounts of the nontaxable stock dividends distributed by it to its shareholders in 1953 and 1954?

Trial was had to the Court without a jury.

On the issues before the Court, the following findings of fact and conclusions of law are made:

## DEDUCTIBILITY OF ROYALTY PAYMENTS

Issue One: Of the payment by the plaintiff in 1955 to S & G Manufacturing, Inc., of $55,872.18, what amount constituted "rentals or other payments required to be made as a condition to the continued use or possession of the machinery" or "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business" within the meaning of Section 162 of the Code?

Plaintiff claims that the amount it deducted as "royalty on machines", i. e., $55,872.18, paid to S & G was a fair, reasonable and allowable deduction under the applicable sections of the Internal Revenue Code.[2]

The Government claims, on the other hand, that plaintiff was not entitled to deduct any amount in excess of $15,000.-00 of the payment made, as a rental or

---

000) and 1954 ($70,000) are excluded from its "accumulated earnings and profits" as of December 31, 1954, its accumulated earnings and profits were $50,-780.34 and the plaintiff was entitled to an accumulated earnings credit of $9,219.-66 ($60,000 — $50,780.34).

If, as the defendant contends, those stock dividends should be included in the plaintiff's accumulated earnings and profits as of December 31, 1954, its accumulated earnings and profits were $200,780.34 and the plaintiff was not entitled to a "minimum" credit, or any credit.

2. Internal Revenue Code 1954 (Sec. 162(a))—TRADE OR BUSINESS EXPENSES.

(a) In General—There shall be allowed as a deduction all the ordinary and neces-

sary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;

(2) travelling expenses (including the entire amount expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business; and

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

other ordinary and necessary expense, and, moreover, that because plaintiff's stockholders owned all of the stock of the corporation to which the payments were to be made, (and in the same proportion as they owned plaintiff's stock) plaintiff must establish—in order to deduct any greater amount—that, independent of any agreement between plaintiff and that corporation, such greater amount was a reasonable value for the use of the property, certain machinery, and one which would have been paid by plaintiff if it had dealt at arm's length with a stranger, and that it was not paid for a purpose other than the use of property. Defendant contends further that although the machinery may have been patented, the assignment of the patent to S & G Manufacturing, rather than the plaintiff E–Z Sew, by its and the plaintiff's common stockholders lacked any substantial business purpose other than the additional tax deduction to be claimed by plaintiff as "rent." The government contends that a reasonable amount for the use of the machinery should take into account only the costs of building the machines, their depreciation, and similar factors, and that no account may be taken of any additional amount as "royalty" because of the existence of a patent.

## FACTUAL BACKGROUND OF PLAINTIFF CORPORATION

Plaintiff taxpayer, E–Z Sew Enterprises, Inc., was incorporated in Michigan on February 27, 1953 by Harold E. Guenther and Sid Schwartz, hereinafter referred to as "Schwartz" and "Guenther". The plaintiff (which in 1962 changed its name to E–Z Enterprises, Inc.) was the successor to a partnership, E–Z Sew Enterprises, which had been formed by Schwartz and Guenther on November 27, 1950. The assets and business of this partnership, in which Schwartz and Guenther had equal interests, were transferred to the plaintiff in consideration for the issuance to Schwartz and Guenther of 500 shares each of the plaintiff's common stock at a par value of $100 per share and of a note payable to them of $26,035.66.

Since its incorporation, plaintiff has issued only common stock with a par value of $100 per share, Schwartz and Guenther each owning one-half of the plaintiff's issued stock. Its authorized and issued shares of such stock have been:

| | Authorized | Issued |
|---|---|---|
| February 28, 1953 | 2,500 | 1,000 |
| December 31, 1953 | 2,500 | 1,800* |
| December 31, 1954 | 2,500 | 2,500* |
| December 31, 1955 | 2,500 | 2,500 |
| December 31, 1956 | 5,000 | 4,500* |
| December 31, 1957 | 5,000 | 4,500 |
| December 31, 1958 | 5,000 | 5,000* |
| December 31, 1959 | 6,000 | 5,500* |
| December 31, 1960 | 6,000 | 5,500 |

* A stock dividend in the amount of the increase over the preceding figure was distributed on the common stock during the year.

Plaintiff's only officers and directors since incorporation have been Sidney Schwartz (President, Treasurer, and Director), Harold Guenther (Vice-President, Secretary and Director) and Sidney Schwartz's brother, Sol (Director).

Guenther and Schwartz had first entered into a business relationship when they became stockholders of Modern Bedding Company in March, 1946. This company was engaged in the manufacture of mattresses and other bedding articles which were sold to retail and department stores.

Within a short time, because of financial difficulties, they decided that in order to meet competition they would have to make a better grade mattress, and decided to attempt to duplicate for their mattresses a particular style of border, known as the "vertical border", which was the most popular on the market and identified the mattresses of the Simmons Company, one of the country's largest mattress manufacturers.

THE MATTRESS BORDER MACHINE

Although it was a plain vertical line border and had been on the market for thirty years, no one in the trade had developed a machine which could duplicate it. Schwartz and Guenther, after close to a year of experimentation, and independent of their Modern Bedding activities, produced a working model in November of 1948. On December 6, 1948, Schwartz applied for a patent on the machine as a "Machine for Making Pre-Built Borders for Mattresses" and on January 16, 1951, U.S. Patent No. 2,538,334 was issued to him. Although the patent was issued to Schwartz and no written assignment of it appears to have been made or recorded with the patent office, Schwartz recognized that Guenther had a one-third interest in it or the income from it.

On May 1, 1949, they formed a partnership called S & G Manufacturing wherein a one-third interest was owned by Guenther and a two-third interest was owned by Schwartz for the manufacture and sale of the machines. Schwartz and Guenther later transferred the assets and business of the partnership at a value of $9,000 to a successor corporation, S & G Manufacturing, Inc., "for tax purposes" in payment for their shares of its stock. Schwartz and Guenther have each owned one-half of the issued stock of S & G Manufacturing, Inc., since its incorporation on January 2, 1952 and the officers and directors of this corporation have been the same persons (Sidney and Sol Schwartz, Harold Guenther) who have been the officers and directors of the plaintiff.

The mattress border machine disclosed by Patent No. 2,538,334 is, according to an experienced mechanical engineer, "a very effective means of accomplishing the end" for which it was designed but "a relatively simple mechanism that consists primarily of standard or relatively simply made parts". Basically the machine operates by intermittently shifting a carriage which holds the mattress border from right to left while transverse lines (72 in Figure 7 of patent) are sewn by its sewing head and by intermittently drawing the border through the carriage (indexing) while longitudinal lines (73) are sewn. While the carriage is moving from its extreme position on the right to the left, or vice versa, the border does not advance through the carriage; when the border is moving through the carriage, the carriage is at rest on the right or the left. The sewing head remains stationary at all times. The "vertical border" which the machine produces, is sewn in the configuration shown as "Figure 7" of the patent. The machine, as disclosed in the specifications of the patent, will sew the configuration shown as "Figure 8" only with one of the two adjacent transverse lines (74 and 75) superimposed on the other; but the drapery header, which was subsequently manufactured by the plaintiff, has the same general configuration as "Figure 8" drawn in the patent.

S & G Manufacturing, both as partnership and corporation, sold these machines under the name "Econo-Stitch Vertical Border Machine," originally at a price of $1,250 each, increasing the price to $2,000 some time between 1949-55. The frame, carriage, and mechanism for reciprocating the carriage and for indexing the border were manufactured by S & G, while the sewing head was purchased from Singer Sewing Machine Co., and installed on the machine by S & G. S & G has advertised since 1949 as among the "Five Star Features" of its mattress border machine that it "is a simple rugged machine designed with every practical economy to eliminate special, complicated or expensive parts;" that "it is so sturdy, its uncomplicated mechanism so accessible, its working parts so few that servicing presents little or no problem. The simple requirements of maintenance on the Singer sewing head are already known to you. * * * All other normal adjustments, repairs, or the possible replacement of standard parts can be made by a competent workman in your own plant with a minimum of time, effort, or expense." S & G further advertised that "change-overs

and adjustments for narrower or wider borders and for narrower or wider spacing between vertical stitchings can be accomplished with a minimum of time loss."

## THE DRAPERY HEADER MACHINE

In the early part of 1950, the general manager of the Detroit branch of the Industrial Division of the Singer Sewing Machine Company introduced Schwartz and Guenther to a local company which was producing "drapery header," which is a cloth tape into which narrow pockets have been sewn. The tape is attached at the top of a drapery, into the pockets of which tape, prongs are inserted, producing a pleated or gathered effect when the drapery is hung. A Mrs. Florence Louden of Canada is sometimes referred to as the inventor of the "header" but in 1956 a patent issued to her in the United States for the header and its associated hooks was declared invalid for want of invention in view of patents which had issued in 1904 and 1908, and she has apparently abandoned efforts to enforce a similar Canadian patent against possible infringers in that country. Prior to 1950, and subsequently, Mrs. Louden manufactured a header, which she sold under the name "No-So" by having women stitch the pockets on tape furnished to them on manually operated sewing machines in their homes, producing some 50 to 60 yards of header in an eight hour day.

Schwartz and Guenther were asked by a local company, having unfilled orders from J. L. Hudson, and others, if they could manufacture a machine that could mass produce a similar type of header.

Schwartz and Guenther were successful in making a "special adaptation" on the patented mattress border machine which was capable of producing about 450 yards of drapery header with closer spacing than the Louden header in an eight hour day, employing one operator to a machine. Although Schwartz testified that building this first drapery header machine (identified as "Model 2" of the mattress border machine) required

"day and night, Saturday, and Sunday" efforts by himself and Guenther over a ten month period, he was never able to state clearly the mechanical difference between the mattress border machine or the nature of the "special adaptation." However, he testified that the major difference between the mattress border machine and the S & G adaptation consisted in the fact that in the latter machine, folded material was fed into the machine, and instead of equal transverse lines being stitched alternately with longitudinal lines, pockets were formed when the longitudinal stitching went on the folded and unfolded material, which were then followed by transverse lines to complete the pocket, and further alternated in size with a second transverse line, thus completing a second pocket of a different size. Mechanically this was accomplished by a folding device which fed the machine. The machine was specially adapted by the arrangement of two Geneva movements making a smooth working arrangement, resulting in a higher speed operation than had been possible with the slower caterpillar arrangement of the original mattress border machine. The machine, thus synchronized with proper timing, operated as the cloth (allowing for proper spacing) moved ahead. This adaptation was regarded as a trade secret by Schwartz and Guenther who testified that they were fearful of patenting it because they did not want their competition to discover it.

Apparently, however, the machine disclosed by Patent No. 2,538,334 was adapted initially to sew the drapery header by adjusting certain pins in the mechanism which indexed the tape as it passed through the carriage. Schwartz and Guenther testified that conversion to the production of drapery header was "just a simple matter of putting this adaptation which, at that time, was quite simple on the machines we had in stock" and that "basically the mechanism was quite similar to the mattress border machine as shown in the patent." They had "felt confident we could produce this

tape with some alteration or some change on the mattress border machine * * * and we wished to stay with what we had at that time." The result—Model 2—was a "simple device."

Subsequently the initial drapery header machine was modified until, by 1955, "Model 5" was in use. "Model 5" was, as an experienced mechanical engineer stated, a "very excellent and very logical step of improvement" from the mattress machine and was "quite logical in the sequence of development."

The first modification of the early machine was to install a second sewing head which enabled the machine to sew two headers simultaneously and double its output. Adding this second head was not a difficult problem mechanically, and the means for reciprocating the carriage and indexing the tape in the mattress border machine was only one of dozens of possible ways in which it could be done. Further improvements increased production to 1,100 yards per machine (and operator) in eight hours, and later (Model 5) to 2,000 yards. With each modification the old mechanism (but not the frame, carriage, or sewing head) would be replaced on the machines, one at a time. Throughout these changes there remained a "basic principle" or "basic mechanism" which was the same as that of the patented mattress border machine. The differences between "Model 5", the drapery header machine in 1955, and the patented machine were, in the former, the use of two sewing heads and of a single motor, and a change in the mechanism which reciprocated the carriage and indexed the tape.

The difference between the two machines were thus in mere details, rather than in substance, and their mechanical principles were the same.

When the mattress border machine had been adapted to sew drapery header, Schwartz and Guenther decided to manufacture and sell such header, and drapery hooks, themselves. For this purpose, they formed the E-Z Sew Enterprises partnership which later (in 1953) was incorporated "most of all for tax purposes, limiting liability, and things like that" as the plaintiff. By the end of 1951, the Kirsch Company, a large distributor of drapery hardware, became their principal (and at that time their sole) purchaser of drapery header and hooks. Meanwhile, their other partnership, and later corporation, S & G, furnished the drapery header machines and installed the subsequent modifications on them which are described above. S & G also did general machine shop work for the plaintiff and other companies.

## THE "ROYALTY AGREEMENT"

When S & G was incorporated in January, 1952, by Schwartz and Guenther, Schwartz and Guenther "as owners" of the patent for the mattress border machine, licensed S & G Manufacturing, Inc., exclusively to manufacture and sell such machines for a period of three years in consideration for its reimbursement of them for their patent expenses in the amount of $432.50. At the same time, S & G Manufacturing, Inc., agreed to furnish Schwartz and Guenther (doing business as the E-Z Sew Enterprises partnership) for three years as many machines "which [are] suitable for producing drapery header" as they required and "to maintain same during the life of this agreement"; Schwartz and Guenther (as the partnership E-Z Sew Enterprises) were to pay to S & G Manufacturing, Inc., one cent (1¢) per yard of drapery header produced by the machines. (The rate of 1¢ per yard was a continuation of the charge which Schwartz and Guenther, as the partnership S & G Manufacturing, had previously made to Schwartz and Guenther, as the partnership E-Z Sew Enterprises.) Beginning in October, 1952, Schwartz and Guenther—the E-Z Sew Enterprises partnership—agreed to pay 1½¢ per yard for the balance of the three years. This increase was due to the fact that double-headed machines were now in use, which, while the cost of manufacturing and maintenance of the machines was said to have been

greater than similar costs for the single-headed machine, nevertheless produced twice as much header in a day.

In February of 1953, when the E–Z Sew partnership was incorporated as the plaintiff, Schwartz and Guenther "wanted assurance [from the S & G Manufacturing corporation which they owned] that the license of the partnership to produce drapery header * * * would be assigned to the [new E–Z] corporation," and they desired a license for a longer period. According to the minutes of the meeting of S & G Manufacturing, Inc.'s directors, S & G "was not at this time able to grant a license for a longer period [because it] was in turn licensed by Sid Schwartz and Harold E. Guenther only for a limited time" but the corporation's officers (Schwartz and Guenther) would "negotiate with [Schwartz and Guenther] for a license for as long a period as could be obtained upon the best terms available." These latter "negotiations" were successful, and two days later Schwartz and Guenther extended their license to S & G Manufacturing, Inc., to manufacture and sell the patented machines until 1968 in consideration for its promise to employ them "in an executive capacity" during the next seven years at salaries "commensurate with their duties as executive officers and with the earnings of the corporation." On the same day, S & G Manufacturing, Inc., agreed to furnish (and to maintain) drapery header machines at a charge of 1½¢ per yard of manufactured header for seven years to Schwartz and Guenther's new corporation, the plaintiff, E–Z Sew Enterprises, Inc. The charge was subsequently reduced (February, 1954) to 1¢ per yard.

Under the agreements stated above, the plaintiff paid to S & G Manufacturing, Inc. the following amounts for the use and maintenance of drapery header machines:

| Year | Machines No. of | Total Payment | Payment Per Machine |
|---|---|---|---|
| 1953 | 13 | $70,197.78 | $5,399.83 |
| 1954 | 13 | 53,594.11 | 4,122.62 |
| 1955 | 13 | 55,872.18 | 4,297.86 |
| 1956 | 13 | 45,505.96 | 3,500.46 |
| 1957 | 13 | 43,587.35 | 3,352.87 |
| 1958 | 14 | 42,328.79 | 3,023.48 |
| 1959 | 14 | 40,056.03 | 2,861.14 |
| 1960 | 14 | 29,016.80 | 2,072.62 |

Between 1953 and 1955 the plaintiff paid S & G a total amount of $179,-664.07, or an average of $13,820.31 per machine; over the eight year period, 1953 to 1960, a total amount of $380,-159.00 or $28,630.91 per machine.

As a result of the various agreements between Schwartz, Guenther, and their two corporations, $380,000.00 of income was shifted between 1953 and 1960 from the plaintiff to S & G, while Schwartz and Guenther avoided any personal income tax on the fruits of their "invention" except to the extent that the corporations paid salaries to them, or either corporation distributed cash dividends to them. In reviewing the amounts paid by plaintiff to S & G Manufacturing, Inc. for the use and maintenance of these machines, it is relevant to observe that S & G sold outright one drapery header machine (double head) in 1954 at a price of $2,017.94 and another in 1957 at a price of $2,250.00 for shipment to companies outside the United States in which the Kirsch Company had a finan-

cial interest. In 1961, S & G sold to the plaintiff at a price of $1,000.00 each the 14 machines which it had previously leased and later that year the plaintiff sold some of these machines to the Kirsch Company and the Western Newell Manufacturing Company at the same price. The machines which were leased to the plaintiff from 1953–1960 were carried on the books of S & G at a total value of $14,850.00 and that amount was stated by S & G as their cost in determining their annual depreciation for the purposes of its federal income tax.

In 1951, the plaintiff could have purchased "Marshall Pocket Machines" at a price of $3,250 each from the United Mattress Company, known to Schwartz to be one of the largest manufacturers of mattress machinery in the United States. This machine produced at least 800 yards of drapery header per eight hour day and required one operator for every four or five machines; its annual maintenance cost for parts was $200.00.

Schwartz and Guenther testified that in determining the charge of 1¢ per yard for the drapery header machines they primarily took into account the costs of their development and the costs of servicing them. However, no record of the actual "costs of development" of either the mattress border machine or of the drapery header machine were kept, and it appears that for the patented machine S & G considered a price from $1,250 to $2,000 sufficient to recover the costs of its development in addition to the cost of actually manufacturing the machine which was sold. In fact, two drapery header machines were sold for less than $2,300 each.

No record was ever kept of S & G's actual expenses in servicing and repairing the drapery header machines leased to the plaintiff. The Singer sewing head was maintained by the plaintiff, which purchased, and installed itself, any required replacement parts. An experienced mechanical engineer described the "underneath mechanism" which S & G was required to maintain and repair, as composed of "Standard [or]

the shelf type of item" or parts which a good machinist could make up on the "ordinary general purpose type of machines, small machines, drill presses, lathes". Nothing about the machines "would give a great deal of difficulty about maintenance", just as S & G had advertised its mattress border machine.

The major expense in maintaining the drapery header machines was labor; the cost of the parts was nominal. An analysis of S & G's labor records for 1954 established that less than 10% of its total of 8677 labor hours, or total labor expense of $26,549, was incurred in work on the machines leased to the plaintiff; and for 1955, less than 23% of its total of 9450 labor hours, or total expense of $33,306, after including in that 23%, jobs (18% of total) which appear from the sequence of their job numbers to have been the manufacturing of mattress border machines.

In 1961 when the plaintiff sold for $1,000 each drapery header machine to the Kirsch Company and the Western Newell Manufacturing Company in an arms-length transaction, it agreed "to maintain, repair, pay insurance and all applicable taxes on [the] machines at a cost to [buyers] of $300.00 per year per machine."

To justify further the large amounts which it paid to S & G for the use and maintenance of the machines, the plaintiff claims:

a) that although the drapery header machine was not patented, the mattress border machine had been patented, and the drapery header machine was "patentable";

b) there was a "secret" device, or "trade secret" connected with the machines; and

c) a "royalty" of 1¢ per yard was comparable to royalties paid under other patents. .

The plaintiff's reliance on the patent for the mattress border machine and the "patentability" of the drapery header machine to justify its payment to S & G ignores the circumstance that even the

monopoly premium which a patent may command cannot, for tax purposes, be placed at any astronomical figure, arbitrarily chosen by the taxpayer. In short, it cannot exceed what "the traffic will bear."

Plaintiff's assumption as to S & G's right to such a monopoly premium is not supported by the evidence. Not only were there other ways mechanically of accomplishing the same result, but a United Mattress machine could have been purchased at less cost than the annual rental paid on *one* of S & G's machines, and with subsequent savings on labor costs. Plaintiff's patent expert testified that because the patented mattress border machines were sold without restriction, a purchaser could adapt that machine to sew drapery header without infringing its patent. Even if it were necessary to purchase the patented machine, the highest premium which S & G's patent commanded was the price (from $1,250 to $2,000) for which those machines were sold by S & G. The primary difference between the first drapery header machine ("Model 2") and the patented mattress border machine was apparently an adjustment of the pins, which step (according to the plaintiff's patent expert) was merely "the next step to one skilled in the art if [he] were told to utilize the mattress machine as shown in Exhibit 3 to make the header machine." We are not persuaded by plaintiff's proofs that these machines (including Models 2 and 5) could be the subjects of a valid patent. Their patentability, however, need not be the subject of final decision by this Court. It is merely one of the elements entering into our resolution of the problems presented.

The plaintiff's evidence has also failed to establish either that there was a "secret" device connected with the drapery header machine or that it had any commercial value. Once again, the mere fact of a "secret", per se, does not establish what should reasonably be paid for its disclosure.

In establishing the charge of 1¢ per yard, Schwartz and Guenther did not measure it against the royalties paid under other patents, evidence of which was offered by the plaintiff, because they either did not know of them or those royalties were not then being paid. Even as an ex post facto justification for the charge, the plaintiff failed to introduce sufficient evidence about the circumstances in which the other royalties were paid to show that such circumstances were comparable to those in which the plaintiff paid 1¢ per yard for the drapery header machines. Each of the other royalties was apparently paid on a patent for a consumer product which could be enforced to prevent the sale of the product, regardless of the process by which it was manufactured; here, S & G's machine was only one of a number of possible machines which could produce drapery header, and the header itself was not patented or patentable in the United States.

The plaintiff also offered testimony of Mr. Starr and Mr. Kisselle as experts concerning the "reasonableness of the royalty." Mr. Starr did not establish the facts as to Mrs. Louden's labor costs which were merely assumed in the hypothetical question put to him. Moreover, in answering the question which also assumed servicing of the machine by the licensor, Mr. Starr had no knowledge of the cost and extent of such servicing, although before making a recommendation to his employer in similar circumstances he would have investigated ("by all means") those facts. Similarly he had no knowledge whether other machines for manufacturing drapery headings were available or what their costs were, and he did not therefore have an informed opinion meriting any serious weight as to whether the royalty asked for the particular machine would be paid at all.

Mr. Kisselle's opinion, in addition to being based on the same assumed but unestablished facts about Mrs. Louden's labor costs, was so closely tied to his conclusions as to the "patentability" of

the drapery header machine that the former can rise no higher than the latter.

In "negotiating" the charge by S & G to the plaintiff of 1¢ per yard of header manufactured for the use of the plaintiff and maintenance by S & G of the drapery header machines, the Court finds in all of the above, considered in the entirety, that the two corporations did not bargain at arms-length as unrelated parties would have bargained. The costs are unwarranted and unreasonable. Specifically, the $55,872.18 which the plaintiff paid to S & G in 1955 was not a reasonable amount for the use and maintenance of the machines and would not have been paid by an unrelated licensee or lessee acting in its own best interests. The evidence also fails to establish any amount greater than $15,000 which would have been reasonable or would have been paid by such a licensee or lessee.

3. (Sec. 531)—IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—

(1) 27½ percent of the accumulated taxable income not in excess of $100,-000, plus

(2) 38½ percent of the accumulated taxable income in excess of $100,000.

(Sec. 532(a))—CORPORATION SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) General Rule—The accumulated earnings tax imposed by Section 531 shall apply to every corporation (other than those described in subsection (b) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

(Sec. 533(a))—EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) Unreasonable Accumulation Determinative of Purpose—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs

## LIABILITY FOR CORPORATE ACCUMULATIONS

Issues Two through Four:

2) Was the plaintiff in 1955 "availed of for the purpose of avoiding the income tax with respect to its shareholders"?

3) What were, with respect to its accumulation of earnings and profits, the "reasonable needs of the plaintiff's business" including its "reasonably anticipated needs of the business", and

4) What part, if any, of the plaintiff's earnings and profits for 1955 did plaintiff establish were retained for the "reasonable needs of the business," including the "reasonably anticipated needs of the business?"

Issues two through four rest upon the same findings of fact as to corporate accumulations under §§ 531–535 [3] and

of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

(Sec. 535(c))—ACCUMULATED TAXABLE INCOME.

(c) Accumulated Earnings Credit—

(1) General Rule—For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b) (6). For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in Section 561) for such year.

(2) Minimum Credit—The credit allowable under paragraph (1) shall in no case be less than the amount by which $60,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year.

(3) Holding and Investment Companies—In the case of a corporation which is a mere holding or investment company, the accumulated earnings credit is the

consequently these finding are set forth as follows without indication of the particular issue to which they relate:

From its incorporation in 1953 through at least 1961, the plaintiff did not pay any cash dividends to its stockholders, Schwartz and Guenther. Stock dividends were paid in 1953 ($80,-000); 1954 ($70,000); 1956 ($200,-000); 1958 ($50,000) and 1959 ($50,-000). If a cash dividend had been paid to Schwartz and Guenther in 1955, they would have paid personal income taxes on that dividend at the following rates: first $600 (Guenther) and first $3,300 (Schwartz), 55%; next $12,000 (both) 58%; next $12,000 (both) 61%; next $12,000 (both) 65%; next $12,000 (both) 68%.

The plaintiff's gross income, net income before federal income tax, and net income after federal income tax was:

| Year | Gross Income | Net Income (Before Tax)* | Net Income (After Tax)* |
|------|--------------|--------------------------|-------------------------|
| 1953 | $1,061,636.03 | $189,683.53 | $ 87,063.91 |
| 1954 | 1,131,608.28 | 224,849.54 | 113,716.43 |
| 1955 | 1,153,902.56 | 220,035.77 | 111,904.48 |
| 1956 | 973,768.64 | 104,065.07 | 56,487.28 |
| 1957 | 900,443.42 | 67,025.01 | 43,128.05 |
| 1958 | 783,188.12 | 46,968.15 | 33,633.36 |
| 1959 | 742,970.68 | 54,945.19 | 40,230.53 |
| 1960 | 579,757.82 | 37,640.94 | 29,279.85 |
| | $7,327,275.55 | $945,213.20 | $515,443.89 |

For three years, 1953–55, the plaintiff's gross income was $3,347,146.87; its net income before federal income tax, $634,568.84; its net income after federal income tax, $312,684.82. If the plaintiff had paid S & G for the drapery header machines only $45,000 for these three years instead of the $179,664.07

amount (if any) by which $60,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year.

(4) Accumulated Earnings and Profits—For purposes of paragraphs (2) and (3), the accumulated earnings and profits at the close of the preceding taxable year shall be reduced by the dividends which under section 563(a) (relating to dividends paid after the close of the taxable year) are considered as paid during such taxable year.

(Sec. 537)—REASONABLE NEEDS OF THE BUSINESS.

For purposes of this part, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.

* After payment of the amounts stated above to S & G.

which it did pay, its net income before tax would have been $769,232.91; after tax, $377,323.57.

The plaintiff's balance sheets as of December 31, were:

| ASSETS | 1953 | 1954 | 1955 |
|---|---|---|---|
| Cash | $123,594.28 | $110,215.13 | $158,036.35 |
| Notes, Accounts, Loans Receivable | 94,584.88 | 209,810.89 | 128,004.54 |
| Inventories | 38,151.89 | 25,463.41 | 26,919.64 |
| Prepaid Expenses | 7,570.87 | 3,668.60 | 2,289.08 |
| Other Investments | 9,133.26 | 22,883.26 | 235,626.83 |
| Depreciable Assets | 125,804.01 | 148,173.08 | 156,050.85 |
| Reserve for Depreciation | (24,617.23) | (47,940.38) | (73,139.35) |
| Accrued Interest U. S. Govt. Obligations | | | |
| | $374,221.96 | $472,273.99 | $633,787.94 |
| **LIABILITIES** | | | |
| Accounts and Loans Payable | 52,335.58 | 44,547.62 | 55,903.22 |
| Bonds, Notes, Mortgages | | | 41,540.17 |
| Reserve for Price Adjustment, etc. | 13,427.93 | | |
| Accrued Expenses | 18,774.92 | 15,749.57 | 7,621.07 |
| Liability for Federal Taxes | 102,619.62 | 111,196.46 | 116,038.66 |
| | $187,158.05 | $171,493.65 | $221,103.12 |
| **STOCKHOLDERS' EQUITY** | | | |
| Paid in Capital | 100,000.00 | 100,000.00 | 100,000.00 |
| Capitalized Earnings (Stock Dividends) | 80,000.00 | 150,000.00 | 150,000.00 |
| Earnings, not Capitalized or Distributed | 7,063.91 | 50,780.34 | 162,684.82 |
| | $187,063.91 | $300,780.34 | $412,684.82 |

| 1956 | 1957 | 1958 | 1959 | 1960 |
|---|---|---|---|---|
| $ 83,789.08 | $ 52,793.10 | $ 79,541.00 | $ 88,451.21 | $106,813.23 |
| 170,004.23 | 122,025.24 | 50,686.16 | 76,273.70 | 68,816.26 |
| 37,636.43 | 46,109.94 | 54,870.70 | 41,671.93 | 57,147.05 |
| 5,997.59 | 2,684.56 | 3,120.34 | 2,848.54 | 4,405.86 |
| 290,778.23 | 303,765.63 | 338,107.38 | 325,220.58 | 370,220.58 |
| 204,424.07 | 247,242.03 | 244,036.18 | 167,342.82 | 158,766.91 |
| (107,394.13) | (130,510.82) | (150,959.16) | (97,271.73) | (112,826.71) |
| | 3,355.48 | 3,623.70 | 6,840.12 | 131.92 |
| | | | 48,948.00 | |
| $685,235.50 | $647,465.16 | $623,026.30 | $660,375.17 | $653,475.09 |
| 86,436.21 | 50,699.79 | 54,471.54 | 50,136.51 | 23,745.95 |
| 73,829.02 | 45,426.02 | | | |
| 3,146.78 | 3,508.26 | | | |
| 52,651.39 | 35,530.94 | 22,621.25 | 24,074.62 | 14,285.05 |
| $216,063.40 | $135,165.01 | $ 77,092.79 | $ 74,211.13 | $ 38,031.00 |
| 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 | 100,000.00 |
| 350,000.00 | 350,000.00 | 350,000.00 | 400,000.00 | 450,000.00 |
| 19,172.10 | 62,300.15 | 95,933.51 | 86,164.04 | 65,443.09 |
| $469,172.10 | $512,300.15 | $545,933.51 | $586,164.04 | $615,443.09 |

The plaintiff paid compensation to Schwartz and Guenther in the following amounts:

| Year | Sidney Schwartz | Harold Guenther |
|---|---|---|
| 1953 | $ 29,866.67 | $ 29,866.67 |
| 1954 | 35,600.00 | 35,600.00 |
| 1955 | 35,600.00 | 35,600.00 |
| 1956 | 35,600.00 | 35,600.00 |
| 1957 | 28,100.00 | 28,100.00 |
| 1958 | 22,600.00 | 22,600.00 |
| 1959 | 26,000.00 | 26,000.00 |
| 1960 | 21,300.00 | 21,300.00 |
| | $234,666.67 | $234,666.67 |

During the period 1953–55, Schwartz and Guenther each received compensation of $101,066.67.

The plaintiff purchased the following securities during these years:

| Year | Issuer | No. of Shares | Cost |
|---|---|---|---|
| 1953 | Kirsch Co. (common) | 875 | $ 9,133.26 |
| 1954 | " " " | 1,000 | 13,750.00 |
| 1955 | E-Z Finance (common) | 500 | 500.00 |
| | E-Z Finance (preferred) | 2,000 | 200,000.00 |
| 1956 | " " " | 500 | 50,000.00 |
| | Clopay Corp. (common) | 2,000 | 5,151.40 |
| 1957 | Kirsch Co. (common) | 200 | 2,636.00 |
| | Clopay Corp. (common) | 5,000 | 10,351.40 |
| 1958 | E-Z Finance (common) | 30,000 | 30,000.00 |
| 1959 | Alma Trailer Co. (common) | 2,500 | 2,616.00 |
| | U. S. Treasury Notes | | 58,915.40 |
| 1960 | E-Z Finance (common) | | 45,000.00 |

The following loans and advances were made by the plaintiff:

| Year Made | Total Amount | Obligor | Terms | Repaid |
|---|---|---|---|---|
| 1953 | $ 5,500 | Korn | Demand | 1953 |
| | 2,981 | Greene | | 1953 |
| | 11,000 | Closures | 6% demand | 1953–1955 |
| 1954 | 18,000 | Closures | 6% demand | 1955 |
| | 50,000 | Weinstein | " " | 1956–1957 |
| | 242,000 | Pontiac Coach | | 1954–1955 |
| 1955 | 10,000 | Sam Schwartz | 6% demand | 1955 |
| 1956 | 35,000 | E-Z Finance | 6% demand | 1957 |
| | 50,000 | Closures | " " | 1957 |
| | 10,000 | Hutchinson | " " | 1957 |
| 1957 | 60,000 | E-Z Finance | 6% demand | 1957–1958 |
| | 45,000 | Weinstein | " " | 1957–1958 |
| | 5,796 | Colonial Investment | | 1958 |
| 1958 | 10,000 | E-Z Finance | 6% demand | 1958 |
| 1959 | 30,000 | E-Z Finance | 6% demand | 1959 |
| | 25,000 | Weinstein | " " | 1959 |
| 1960 | 30,000 | E-Z Finance | 6% demand | 1960 |

These loans were made whenever the plaintiff had "reserve cash" as "just a chance to make an additional income."

One of the debtors, Closures, Inc., was a corporation which manufactured plastic folding doors. It was owned by Mrs. Schwartz (38%) and Mrs. Guenther (38%) and utilized Mr. Schwartz and Mr. Guenther as its general managers. However, it did not buy drapery hooks or header from the plaintiff.

Weinstein & Weinstein were local attorneys and personal friends of Schwartz and Guenther. The loans to them were not related to plaintiff's drapery header and hook business.

Pontiac Coach Company was a trailer manufacturer, to whom plaintiff had made insignificant sales.

The plaintiff's "Notes, Accounts, and Loans Receivable" as of December 31 were:

| Accounts Receivable | 1953 | 1954 | 1955 | 1956 | 1957 |
|---|---|---|---|---|---|
| Trade | $50,313 | $ 67,754 | $ 59,512 | $ 36,818 | $ 68,000 |
| Closures | 33,364 | 40,323 | 16,195 | 4,973 | |
| Loans Receivable | | | | | |
| Closures | 9,000 | 19,500 | | 50,000 | |
| Weinstein | | 50,000 | 50,000 | 27,237 | 10,000 |
| Pontiac Coach | | 30,000 | | | |
| Hutchinson | | | | 10,000 | |
| E-Z Finance | | | | 36,065 | 35,000 |
| Colonial Inv. | | | | | 5,796 |
| Employees | 75 | 685 | | | |
| Miscellaneous | 1,832 | 1,341 | 1,710 | 1,329 | 729 |
| Contract Receivable | | | | 3,579 | 2,499 |
| | $94,584 | $209,604 | $128,002 | $170,004 | $122,024 |

The plaintiff's "Accounts and Loans Payable" as of December 31, included the following account payable to S & G:

| | 1955 | 1956 | 1957 |
|---|---|---|---|
| (a) Total Account Payable | $55,903 | $86,436 | $50,699 |
| (b) Account Payable to S & G | 44,449 | 80,676 | 40,868 |
| %, (b) to (a) | 79.5% | 93.3% | 80.6% |

The plaintiff's "Bonds, Notes, and Mortgages payable" as of December 31 were:

| Creditor | 1955 | 1956 | 1957 |
|---|---|---|---|
| Sidney Schwartz | $23,443 | $47,153 | $26,094* |
| Harold Guenther | 13,096 | 16,471 | 4,470** |
| SanG of Canada | 5,000 | 10,000 | 14,861 |
| | $41,539 | $73,624 | $45,425 |

*Of which $4,039 was payable to his wife.

**Reduced by an indebtedness of $1,874 of his wife.

The accounts payable to Schwartz and Guenther were for salaries or bonuses which had not been withdrawn by them. SanG of Canada was a Canadian corporation which manufactured drapery header. It, like Closures, Inc., was managed by Schwartz and Guenther, and owned by their wives.

The plaintiff's earnings (before depreciation), from its incorporation to December 31, 1955, were $380,980.00; these earnings were applied by the plaintiff as follows:

| | |
|---|---|
| Increase in cash | $161,219.65 |
| Increase in other cur. assets* | (26,515.55) |

| | |
|---|---|
| Net increase in cur. assets | 134,704.10 |
| Increase in liabilities | (98,144.29) |
| Increase in working capital* | 36,559.81 |
| Increase in depreciable assets | 108,793.36 |
| Increase in "other investments" | 235,626.83 |
| | $380,980.00 |

*Excluding the Kirsch Co. shares.

Between 1953 and 1955 the plaintiff used 62% of its earnings to acquire "other investments" which were (as of December 31, 1955):

| | |
|---|---|
| 1,875 shares, common stock, Kirsch Co. | 22,833.26 |
| 500 shares, common stock, E-Z Finance | 500.00 |
| 2,000 shares, preferred stock, E-Z Finance | 200,000.00 |
| unimproved real estate | 12,239.17 |

———◆———

From 1953 to at least 1961 the plaintiff principally manufactured drapery header and drapery hooks (both for use with the header and without it). Until 1957 the Kirsch Company was almost the plaintiff's sole customer for these products. These were sold by it, in a package, as "Easypleat", the account being settled promptly, within 30 days. The plaintiff had no real competition in the manufacture of the drapery header, until a header for which the pockets are woven in the cloth was introduced in 1953.

Plaintiff's inventory consisted of cotton piece goods, thread, wire (for hooks), and packaging materials. It was planned on a three to six month basis, but could be so managed as to avoid personal property taxes at the end of the year.

With respect to plaintiff's failure to declare a cash dividend from moneys reasonably and unquestionably available for such purposes, plaintiff relied on three asserted needs of its business at the end of 1955:

a) the relocation of its business;

b) its "diversification," or expansion into the manufacture of other products;

c) its "cash requirements" for 1956.

For the first two needs, Schwartz could not suggest any positive action by the plaintiff's officers at the end of 1955. They were, it was said, "thinking and talking". They testified that in 1954 the Detroit newspapers "had quite a big spread", a "big news story", to the effect that the area in Detroit in which plaintiff's business was located (as the tenant of a corporation owned by Schwartz) was to be condemned for a medical center. The announcement it was said, "made it sound immediate and in a rush", and for this reason, according to their testimony, the plaintiff purchased some unimproved real estate in Plymouth, Michigan. In anticipation of the cost of constructing a new factory and relocating its business, it was required in 1955, it was asserted, to continue to accumulate its earnings without the payment of any dividends. Although the first definitive public disclosure of the City Planning Commission's "medical center project" was in

May of 1956, plaintiff relies upon newspaper articles published in 1954 to support its claim. A study of the articles relied upon (Detroit News, September 26 and August 14, 1954) discloses that the latter article discusses the "New Wayne Campus" and the former tells of a plan to "Seek City's Best Brains to Plan Cultural Center." Both articles are, at best, merely surveys of long range plans for local improvements. It is clear that neither article is definite enough to constitute a threat or create any business need to plan for relocation. An official of the City Planning Commission testified (and the Commission's official records confirm) that consideration of the project within the Commission, at the request of the four hospitals in the area, began only in late May, or June, 1955. Moreover, at the time of the trial, the section of the project in which the plaintiff is located was not expected to be condemned for another two years. Plaintiff is still located there and its officers have never done anything more towards the construction of a new building other than "just conversation with a close friend in the building game" and have obtained neither written estimates nor construction plans.

It is beyond question that this alleged "need" for the accumulation of plaintiff's earnings did not exist in 1955, and the plaintiff, apart from the purchase of the Plymouth land in February, has never had a definite plan, nor has it taken any action toward building a new factory, or relocating its business, which would justify its failure to pay dividends.

The plaintiff's officers realized, particularly as a result of certain discussions which they had with officials of the Kirsch Company in 1954, that the demand for their drapery header and hooks might decline, or that Kirsch might obtain another supplier, or possibly begin manufacturing the products itself. By the end of 1955 their apprehension in this regard had somewhat abated. At the same time the plaintiff had accumulated substantial cash reserves which, it is clear from, in part, its substantial loans to others, obviously were not needed in its business. Moreover, during the first part of 1955 the plaintiff negotiated, without success, to purchase one of two businesses, but after its investment in the E–Z Finance Co. in July, 1955, (hereinafter described) no further efforts of this nature were made or seriously contemplated for at least a year and a half. Discussion was also had of manufacturing "campers," but it was not until 1963 that plaintiff actually began such manufacture. The problem in 1955 was not so much one of the plaintiff having "all of its eggs in one basket", as Mr. Schwartz explained, as the fact that there were too many eggs for the basket. To further utilize the analogy suggested by Mr. Schwartz, the plaintiff had to choose between investing the surplus elsewhere or distributing it to its stockholders before those extra eggs became rotten.

Continuing our review of plaintiff's financial situation, during 1955 it acquired 2000 shares of the preferred stock of the E–Z Finance Company at $100 a share, together with 500 shares (50%) of its common stock at $1 a share. The plaintiff subsequently acquired all of the preferred shares, which were not redeemable by the corporation for five years, holding them until 1961, when it sold one-half to a partnership (Colonial Investment Company) owned by Sidney Schwartz's brothers, Sam and Sol Schwartz, converting the other half into common stock. Colonial Investment, above-mentioned, owned 25% of the common stock of E–Z Finance, and Melvin Hutchinson, a trailer manufacturer, another 25%. E–Z Finance (which subsequently changed its name to "Financial Acceptance Corporation") was incorporated in July, 1955 to finance the purchase of trailers manufactured by Hutchinson. It was managed by Sam Schwartz, from Sol Schwartz's law office, and the plaintiff's officers did not participate in its day-to-day operations. After 1955, the plaintiff loaned substantial amounts to

E–Z Finance and acquired additional shares of its common stock. We have gone into this matter because it cannot be doubted from the testimony that the plaintiff invested in E–Z Finance in order to put its cash surplus to work. As Sol Schwartz admitted, the plaintiff "deliberately adopted the method of preferred stocks that were redeemable" so that at a future date it would "be able to get the money back from the preferred stock for E–Z Sew's other needs in terms of manufacturing." It is clear the investment of the plaintiff's earnings in E–Z Finance, like its substantial loans to other corporations owned or controlled by its stockholders, was not proximately related to its business but was, rather, a device employed by the plaintiff to avoid the income tax which its stockholders would have paid on the proper distribution to them of those earnings.

The testimony of the plaintiff's officers as to its "needs" for cash for operating purposes in 1956 is not persuasive. Schwartz admitted that its anticipated revenues in the first three months of 1956 exceeded its anticipated expenditures for that period. Guenther recognized that the existing "working capital was much greater than needed." In any event, in 1956 the plaintiff had at least enough surplus cash to lend $95,000 to others, while 80% of its "accounts payable" and all of its "bonds, notes, and mortgages payable" on December 31, 1955, were obligations owed to Schwartz and Guenther or corporations controlled by them. The decision to invest over $200,000 in an unrelated business (E–Z Finance) is most persuasive in establishing that the plaintiff's officers did not recognize then the need to maintain the large cash reserve for current expenses which they would now claim was so essential.

## ACCUMULATED EARNINGS CREDIT

Issue Five: Whether the plaintiff's earnings and profits for the purpose of Section 533(a) and its "accumulated earnings and profits" for the purpose of Section 535(c) (2) included the amounts distributed by it to its shareholders in 1953 and 1954?

This issue is solely a question of law, the facts having been stipulated by the parties and now found by this Court to be as follows:

The only dividends declared and paid by plaintiff during the years 1953 through 1960, inclusive, were stock dividends as follows:

1953: 800 shares of common stock
1954: 700 shares of common stock
1955: NONE
1956: 2000 shares of common stock
1957: NONE
1958: 500 shares of common stock
1959: 500 shares of common stock
1960: NONE

## CONCLUSIONS OF LAW

This Court has jurisdiction over the parties and subject matter of this action.

Plaintiff's Exhibits (25) and (26), submitted to the Court on August 27, 1964, are admitted over the objections of the defendant.

The Defendant's Motion to Vacate the Order of April 16, 1964, Impounding Plaintiff's Answer to Interrogatory No. 13(a) and Restricting Disclosure by the Defendant of the Information Contained in that Answer is granted, and the Order is hereby vacated.

The defendant's motion to admit into evidence its Exhibits QQ and RR, is granted; defendant's motion to admit into evidence its Exhibit SS as supplemented by plaintiff, is granted, and those exhibits are hereby admitted into evidence.

## DEDUCTIBILITY OF "ROYALTY" PAYMENTS

To be deductible under the Internal Revenue Code an expense must be "ordinary and necessary * * * paid or incurred during the taxable year in carrying on any trade or business, and [includes] * * * 3) rentals or other payments required to be made as a condition to the continued use or possession, for the purposes of the trade or business, of property." I.R.C.1954 § 162(a).

Royalties as such are not delineated in this section of the Code but have been held by the courts to be subject to the same prerequisites as rental payments for deductibility under this Section. Commissioner of Internal Revenue v. Gregory Run Coal Co., 212 F.2d 52 (CA 4 1954).

While the word "reasonable" is not contained in the applicable section, the element of reasonableness has been held to be inherent in the phrase "ordinary and necessary." Commissioner of Internal Revenue v. Lincoln Electric Co., 176 F.2d 815 (CA 6 1949), and "rentals or other payments for the use of property which are excessive in amount, taking into consideration all the facts of the particular case, do not constitute ordinary and necessary business expenses. Limericks, Inc. v. Commissioner of Internal Revenue, 165 F.2d 483 (CA 5 1948).

■ Excessive payments for the use of property are not deductible, because such amounts are not "required to be made as a condition to the continued use or possession of [the property]." Utter-McKinley Mortuaries v. Commissioner of Internal Revenue, 225 F.2d 870 (CA 9 1955).

In Place v. Commissioner of Internal Revenue, 17 T.C. 199, aff'd per curiam, 199 F.2d 373 (CA 6 1952), the Court held:

> "The inquiry is whether the petitioner was in fact and at law 'required' to pay these sums as rent. When there is a close relationship between the lessor and the lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger."

Transactions between related parties require a "careful scrutiny" to determine how much was paid in the "guise of rent", but which are actually in "no sense a legitimate business expense."

Limericks, Inc. v. Commissioner of Internal Revenue, supra, 165 F.2d 484. The "mere fact that the expense was incurred under contractual obligation does not of course make it the equivalent of a rightful deduction." Interstate Transit Lines v. Commissioner of Internal Revenue, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607.

■■ Of course if the contract itself is made between parties, who, though closely related, are dealing at arm's length, and its terms are persuasive of its reasonableness, such a deduction could be sustained. However, the burden is on the taxpayer to establish that it has overpaid its taxes. The burden has been described by one court as follows:

> "The burden imposed by the statute to permit deductions for rentals is onerous. Taxpayer must have proved to the trial court that the payments were wrung from it by compulsion of circumstances delineated by law. The question whether surrounding conditions drove taxpayer through this narrow gate was surely one of fact."

Utter-McKinley Mortuaries v. Commissioner of Internal Revenue, 225 F.2d 870 (C.A. 9 1955).

This "onerous" burden has not been sustained by the taxpayer. A reasonable charge for the use of property cannot be inflated by a shifting—without any other substantial business purpose—of a patent among related parties who, we have concluded, are not dealing at arm's length. Taxpayer's claims as to the unique nature of its property, due to "patentability", "trade secrets", utility and the like, are not supported by the record before us.

We find as a matter of fact and law that the deduction claimed by the plaintiff in 1955, to the extent that it was disallowed by the Commissioner of Internal Revenue was not "an ordinary and necessary business expense" or a "rental or other payment required to be made as a condition to the continued use or possession of property" under Section 162(a) of the IRC 1954.

## LIABILITY FOR CORPORATE ACCUMULATIONS

Section 531 of the 1954 Internal Revenue Code imposes an accumulated earnings tax on "every corporation * * * availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed."

█ Section 533(a) provides that: "* * * the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." The forbidden purpose need not be the sole, primary, or dominant purpose of the accumulation, Barrow Manufacturing Co. v. Commissioner of Internal Revenue, 294 F.2d 79 (5th Cir. 1961), but "[i]t is sufficient if it is *one* of the determining purposes." World Publishing Co. v. United States, 169 F.2d 186, 189 (10th Cir. 1948).

"[W]hile the ultimate determination [under Section 533(a)] concerns the presence of a purpose to avoid income tax upon shareholders, the real controversy, as perhaps is the situation in most cases of this type, concerns the presence or absence of a valid business reason for accumulating earnings." American Metal Products Corp. v. Commissioner of Internal Revenue, 287 F.2d 860 (8th Cir. 1961).

The taxpayer points out (proposed findings #103) (page 49) that "recent cases decided since the trial of this case have indicated that the needs of the corporation, the picture as it was presented to the directors, during and particularly at the close of the taxable year, and the availability of liquid assets for dividend declaration, are all factors to be taken into consideration in determining whether the accumulation was reasonable or not." (citing cases). These business reasons may, of course, be as varied as the ingenuity of the modern business-man may invent, depending upon various factors of judgment and experience. However, while the Court will not sit in judgment as to the business acumen of the corporation's officers, the exercise of their judgment must be reasonable and their determination as to the business nature of these "needs" must be credible and supported by the testimony before the Court. The burden is a difficult one which this taxpayer has not sustained.

█ Among the needs which do not justify accumulations of earnings are loans "having no reasonable relationship to the conduct of the business," including loans to another corporation ("the business of which is not that of the taxpayer corporation") controlled by the taxpayer's shareholders, and "investment in properties, or securities which are unrelated to the activities of the business of the taxpayer corporation." Treasury Regs., Sec. 1.537–2 (26 CFR Sec. 1.-537–2)

█ As to future needs, something more than mere speculation is needed. There must be an "indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation." Treas.Regs., Sec. 1.537–1(b), 26 CFR Sec. 1.537–1(b). As long as such a *definite* plan exists, it is not necessary that the corporation use the accumulation immediately. *Ibid.* Unless future needs are more than simply vague notions in pursuance of which nothing definite or specific has been planned, or where the execution of a plan has been postponed indefinitely, the accumulation cannot be justified on the grounds of reasonably anticipated needs of the business. *Ibid.*

█ On the basis of the facts found above, this Court finds as a matter of fact and law that the plaintiff in 1955 was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed and was liable

for the accumulated earnings tax imposed by Section 531 of the Internal Revenue Code, 1954. Plaintiff has not sustained the burden imposed upon him under the applicable sections.

## ACCUMULATED EARNINGS CREDIT (§ 535(c))

Section 531 imposes an accumulated earnings tax on the "accumulated taxable income" of a corporation "availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed." This Court has found the plaintiff was so "availed of" in 1955.

"Accumulated taxable income" is defined in Section 535(a) as "the taxable income * * * minus * * * the *accumulated earnings credit*." Where applicable, this credit reduces the corporation's accumulated taxable income for the purpose of computing its tax and therefore reduces the amount of tax for which the corporation is liable.

Section 535(c) provides that "the accumulated earnings credit" is "(A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business" [described as a "general" credit] and provides further that this "credit * * * shall in no case be less than the amount by which $60,-000.00 [the amount in 1955] exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year." [described as the "minimum" credit].

■ The effect of Section 535(c) is to limit the application of the accumulated earnings tax to the portion of the earnings for the taxable year which are not necessary for the reasonable needs of the business, and also to permit a minimum accumulation of earnings and profits as of the end of the preceding taxable year—of at least $60,000, irrespective of whether they are necessary for the reasonable needs of the business. Mertens, Vol. 7, § 39.25. If the earnings accumulations exceed the minimum

credit, the allowable (or general) credit is then determined on the basis of proof of retention for the reasonable needs of the business, without regard to the minimum credit. Mertens Code Commentary, Vol. 7, Section 535:3, Ch. 1, Subch. G, p. 15.

Plaintiff thus may be entitled to either a "general" credit, "a minimum" credit or both under this Section.

We will dispose of the matter of the "general" credit first as plaintiff has based its primary reliance upon its right to the "minimum" credit.

## THE "GENERAL" CREDIT

Under § 535(c), a corporation is entitled to a credit *determined* by the extent to which its "earnings and profits for *the* taxable year [were] retained for the reasonable needs of the business." If *none* of its earnings and profits for the taxable year were retained for the reasonable needs of its business, a corporation is not entitled to any general credit. On the other hand, if all of its earnings and profits for the taxable year can be shown by the taxpayer to have been retained for the reasonable needs of its business, the general credit could reduce the corporation's "accumulated taxable income" to zero with no resulting tax liability.

It is clear that "in determining whether any amount of the earnings and profits of the taxable year has been retained for the reasonable needs of the business, the accumulated earnings and profits of prior years will be taken into consideration. Thus, for example, if such accumulated earnings and profits of prior years are sufficient for the reasonable needs of the business [for that prior year], then any earnings and profits of the current year which are retained will not be considered to be retained for the reasonable needs of the business [for that current year]." Treas.Regs., Sec. 1.535–3(b) (ii), 26 C. F.R., Sec. 1.535–3(b).

Taking into account the plaintiff's accumulated earnings and profits from prior years, over 60% of which the

plaintiff applied to its investment in an unrelated business, and in view of plaintiff's cash balance of $158,036 (Ex. 14, par. 12), its accounts and loans receivable of $128,004, (Ex. 14, par. 12) and its investments during 1955 of $250,000 in the securities of an unrelated business, the Court makes the following conclusion of law:

The plaintiff has failed to prove that any part (or, if any part, what part) of its earnings and profits of $111,904 in 1955 were "retained for the reasonable needs of the business"[4] and therefore plaintiff is not entitled to any (general) accumulated earnings credit for 1955.

## THE "MINIMUM CREDIT"

The minimum "accumulated earnings credit" results from an arithmetical computation of the amount, if any, by which $60,000.00 exceeds the corporation's "accumulated earnings and profits * * * at the close of the preceding taxable year." If the corporation's "accumulated earnings and profits * * * at the close of the preceding taxable year" are more than $60,000, it is not entitled to any *minimum* credit. (The matter· of the general credit provided by this section has been disposed of supra.)

The plaintiff's "earned surplus and undivided profits" on December 31, 1954, as stated on its balance sheet (Ex. 14, par. 12) was $50,780.34. To this amount was added its stock dividend in 1953 of 800 shares, capitalized at a value of $80,000 (Ex. 14, par. 10) and its stock dividend in 1954 of 700 shares (Ex. 14, par. 10) capitalized at a value ·of $70,000. With these additions, the plaintiff's "accumulated earnings and profits * * * at the close of the pre-·ceding taxable year" were $200,780.34 .and because this amount is greater than $60,000.00 the plaintiff was not allowed .any minimum credit for 1955.

Without the addition of these stock dividends, plaintiff's accumulated earnings and profits for 1955 were $50,780.34 and both parties agree that the plaintiff would be entitled to a minimum credit of $9,219.66 ($60,000.00−50,780.34).

The non-recognition of a past stock dividend as reducing the corporation's "accumulated earnings and profits * * at the close of the preceding taxable year" is consistent with the Code's express nonrecognition for the purposes of the accumulated earnings tax of a stock dividend distributed during the taxable year. (See IRC 1954, §§ 535 (c) (1), 561, 562(a)).

As to "earnings and profits" the Code provides for certain adjustments which must be made either by reason of the distribution of property or the receipt of property by the corporation. The Code provides for adjustments to "earnings and profits" where there is a nonliquidating distribution of *property* by a corporation with respect to its stock. Section 317(a), however, defines *property* to mean "money, securities, and any other property," *but it does not include stock in the corporation making the distribution.* Since the term does not include a distribution by a corporation in its own stock which is not taxable to the recipient, there would be no resulting adjustment to earnings and profits. Mertens, Code Commentary, Sec. 312(a):1, Ch. 1, Subch. C, page 92. It is clear under the applicable provisions of the code that no adjustments are to be made to the "earnings and profits" of a distributing corporation where stock is distributed and no gain is recognized to the distributee. On the other hand, if under Section 305 (b) the distribution is taxable to the recipient, then adjustment to the "earnings and profits" would be proper. Sec. 312(d):1, Ch. 1, Subch. C, pg. 97.

Section 305(a) provides that a distribution "by a corporation to its shareholders, with respect to the stock of

---

4. Motor Fuel Carriers v. United States, 322 F.2d 576 (5th Cir. 1963) on remand, D.C., 244 F.Supp. 380.

such corporation, in its stock or in rights to acquire its stock" *is not includible* in the shareholder's gross income (unless the shareholders can elect to receive property (other than stock) instead of the stock or the distribution is made in discharge of preference dividends.)

 Since no gain is recognized or taxed to its shareholders from the distribution of a stock dividend on the facts before this Court, we find that the "earnings and profits" of this plaintiff are not reduced in the amount of the stock dividend. 1 Mertens, § 9.42, Ch. 9, pg. 83. As the government points out, if the rules were otherwise, a corporation could forever defeat the imposition of an accumulated earnings tax by annual distributions of non-taxable stock dividends.

In its brief, plaintiff argues that the "United States Supreme Court has only by a thin majority determined that the stock dividends in question are not taxable income \* \* \*" ("Supplemental Trial Brief, p. 4"), and that this Court should be persuaded by the failure of the Commissioner to pursue his earlier arguments that these were in fact *taxable* income. The fact that the Commissioner may have changed his position regarding this issue is of no moment. We are concerned with the state of the law as it applied to the parties before this Court. While the Commissioner is indeed an unusual litigant, he is in many respects not unlike an ordinary litigant and is not bound as a rule by arguments made over a period of years in a number of courts. The Commissioner is not compelled to take an initial position and maintain it under all circumstances. This is particularly true in this case since the 1954 code introduced a new deduction in the form of the "accumulated earnings credit" to alleviate some of the hardships to which the taxpayer had been subject under the 1939 Code. Mertens, Vol. 7, § 39.25,

Ch. 39, pg. 40. It is also to be pointed out that the plaintiff is not claiming any reliance upon a position taken by the Commissioner nor attempting to urge that the Commissioner is now barred from changing his position and collecting the tax under an estoppel principle.

 Whether by thin majority or undivided court, the position taken by the Supreme Court of the United States, needless to say, controls our decision. After a consideration of the law cited by both parties, the more persuasive authority requires a determination that the stock dividends here involved are not taxable income. We are not persuaded by plaintiff's arguments or its reliance upon Harry A. Koch Co. v. Vinal, 228 F.Supp. 782 (D.C.Neb.1964), a District Court case, the discussion of which is not particularly helpful as to the issues before *this* Court, in view of the applicable provisions of the Code (e. g. §§ 305(a), 312(d), 316(a) and 531 et seq.), and authorities such as Electric Regulator Corporation v. Commissioner of Internal Revenue, 336 F.2d 339 (2d Cir. 1964).

This Court finds as a matter of fact and law that the plaintiff's accumulated earnings and profits within the meaning of Section 535(c) (2) of the Internal Revenue Code as of December 31, 1954, exceeded $60,000.00 and it is not therefore entitled to a minimum credit as provided by the Code.

CONCLUSION

On all issues before the Court, we find in favor of the Defendant that plaintiff has not proven that it overpaid to the defendant its taxes for the year 1955.

A judgment shall be entered dismissing plaintiff's complaint, and costs may be taxed.

ORDER

An order may be presented in accordance with the foregoing.