Southeastern Canteen Co. v. Commissioner. Canteen Service Co. of Toledo v. Commissioner.
Southeastern Canteen Co. v. Commissioner
Docket Nos. 4301-64, 4302-64.
United States Tax Court
T.C. Memo 1967-183; 1967 Tax Ct. Memo LEXIS 77; 26 T.C.M. (CCH) 891; T.C.M. (RIA) 67183; September 19, 1967
John J. Kendrick, 811 Madison Ave., Toledo, Ohio, for the petitioners. John P. Graham, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows: Taxable year
Petitioner
Docket No.
ended
Deficiency
Southeastern Canteen Co.
4301-64
Oct. 3, 1959
$ 4,936.32
Oct. 1, 1960
5,458.89
Sept. 30, 1961
6,194.61
Canteen Service Co. of Toledo
4302-64
Sept. 30, 1961
58,863.73
The cases have been consolidated and will be decided together. The issues for decision are: (1) Whether the purported *79 rentals paid or accrued in favor of the Gladieux Corporation by petitioners for their fiscal year ended September 30, 1961, constitute allowable deductions from their respective gross incomes in that year, pursuant to section 162(a)(3) of the Internal Revenue Code of 1954. [1]
(2) Whether the location commissions paid or accrued in favor of the Gladieux Corporation by petitioners for their fiscal year ended September 30, 1961, constitute allowable deductions from their respective gross incomes in that year, pursuant to section 162(a) of the Code. (3) Whether respondent properly disallowed Southeastern Canteen Co. a statutory surtax exemption for its fiscal years ended October 3, 1959, October 1, 1960, and September 30, 1961, pursuant to section 269 or 1551 of the Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner Canteen Service Co. of Toledo (hereinafter called Canteen Service) is, and at all times pertinent hereto was, a corporation incorporated March 16, 1946, under the laws of the State of Ohio with its principal *80 office in Toledo, Ohio. For the tax year ended September 30, 1961, Canteen Service filed its corporate income tax return with the district director at Cleveland, Ohio, listing its corporate address as 3156 Bellevue Road, Toledo 6, Ohio. Petitioner Southeastern Canteen Co. (hereinafter Southeastern) is, and at all times pertinent hereto was, a corporation incorporated under the laws of the State of Michigan on January 19, 1956. Its registered office was in Detroit, Michigan, and its corporate officers were housed in Toledo, Ohio. For the tax years ended October 3, 1959, October 1, 1960, and September 30, 1961, Southeastern filed its corporate income tax returns with the district director at Cleveland, Ohio, listing its corporate address as 3156 Bellevue Road, Toledo 6, Ohio. At the time Canteen Service was incorporated, its entire capital common stock was issued to Ben T. Handwork (hereinafter Handwork) in exchange, among other things, for the use by Canteen Service of a franchise previously granted to Handwork by Automatic Canteen Company of America (hereinafter sometimes Automatic) for the sale of candy, gum, nuts, and related items through vending machines. In early 1953, Canteen *81 Service, with the oral permission of Automatic, began operating eight canteen locations at the Revco Manufacturing Co. in Deerfield, Lenawee County, Michigan. On May 15, 1956, Canteen Service filed a notice of withdrawal with the Michigan Corporation and Securities Commission and, subsequent to that date, no longer conducted business in Michigan. During the tax year involving Canteen Service, 1961, its books and records were maintained under the accrual system of accounting and the 13-period system of tabulating its income and expenses was employed, each such period consisting of 4 weeks. During that year, Canteen Service sold food and beverages through vending machines in certain territories in western Ohio, such territories being among those originally designated in a franchise and distributor's lease agreement entered into between Automatic and Handwork on July 6, 1947, and assigned to Canteen Service on that day by Handwork with the consent of Automatic. Under this franchise and lease agreement, Canteen Service leased canteens [2] from Automatic in its fiscal year 1961, in numbers varying from 1,627 to 1,676, and reported to Automatic gross sales from those canteens of $1,318,901. *82 Canteen Service reported on its tax return for fiscal 1961, gross sales of $1,651,490.29. [3]
Upon the incorporation of Southeastern in 1956, its authorized capital stock consisted of 1,000 common shares of the par value of $50. Of that amount, Virgil Gladieux (hereinafter sometimes referred to as Virgil) and Handwork subscribed for 15 shares and 5 shares, respectively. On July 21, 1959, Southeastern redeemed the 5 shares owned by Handwork which redemption resulted in Virgil's becoming the owner of Southeastern's entire outstanding common stock. During the tax years involving Southeastern, its books were maintained under the accrual system of accounting and the 13-period system of tabulating its income and expenses was employed, each such period consisting of 4 weeks. During those years, Southeastern had the exclusive rights *83 to the sale of food and beverages through vending machines in Lenawee and Monroe Counties in southeastern Michigan, such counties being among those originally designated in a franchise and distributor's lease agreement entered into between Automatic and Handwork on January 20, 1956, and assigned to Southeastern on that day by Handwork with the consent of Automatic. Under this franchise and lease agreement, Southeastern leased canteens from Automatic in its fiscal year 1961, in numbers varying from 252 to 273, and reported to Automatic gross sales from these canteens of $185,469. Southeastern's franchise from Automatic provided not only for exclusive territory but also for the leasing of canteens from Automatic to Southeastern for rent. It also provided that Southeastern was to periodically deliver to Automatic a report of the canteen sales, from which such rentals were determined. It provided further that title to the rented canteens was to remain in Automatic, that Southeastern was prohibited from attaching its name to the canteens except to show that it was servicing such equipment, that the franchise could be canceled under certain circumstances, and that a sum of $50 would be *84 payable by Southeastern to Automatic, as liquidated damages, for each canteen if either the franchise was canceled or if there was any interference by Southeastern with the continued ownership and use of such canteen location by Automatic. The franchise further provided that if Handwork disposed of, or attempted to dispose of the franchise by sale, assignment, transfer, rent, or sublease, without the prior consent of Automatic, the franchise agreement was to be null and void. Southeastern commenced business on January 21, 1956, starting its route operations with vending machines, inventory, and trucks. As of that date, Southeastern's capital was $1,000. On January 23, 1956, Southeastern's directors, at their first board meeting, adopted resolutions, among other things, to purchase vending machines from Automatic and to open an account at a bank in Monroe, Michigan. Southeastern employed a resident of each of those counties to supervise the company's operations. Thus, at its inception, Southeastern's operations were conducted from the Michigan residences of those two employees. Later, Southeastern established warehouse and refrigeration facilities in Monroe County, Michigan. Although *85 Southeastern acquired certain operating assets and leased vending machines from Automatic, as provided in its franchise agreement, Automatic had no stock interest in Southeastern. Prior to May 10, 1946, the Gladieux Corporation (hereinafter Gladco) [4] was principally engaged in the business of operating cafeterias and lunch counters, and dispensing food in several manufacturing plants in the city of Toledo and vicinity. It also sold candy, gum, and nuts both over its counters and through vending machines at such food locations, at gas stations, and other locations. Gladco's books and records were maintained on the accrual system of accounting and on a calendar year basis. As of May 10, 1946, Gladco's outstanding capital stock was owned equally by Virgil Gladieux and his brother Nelson. On May 25, 1955, Virgil became the sole stockholder of Gladco. *86 On May 10, 1946, an agreement was entered into between Gladco and the Gladieux brothers, on the one hand, and Canteen Service and Handwork, on the other. Pursuant to the agreement, Gladco transferred its vending machine business in Lucas, Fulton, and Wood Counties, Ohio, to Canteen Service. The agreement provided, in part, that Canteen Service would pay Gladco a 12 percent commission on all gross sales of candy, gum, and nuts sold by Canteen Service through vending machines at all locations within Lucas, Fulton, and Wood Counties, Ohio, where Gladco "now or hereafter [operates] cafeterias, lunch counters or other food dispensing facilities." Pursuant to that provision and prior to 1958, Canteen Service paid a 12 percent location commission to Gladco on sales made by Canteen Service through vending machines located at the facilities of Libbey-Owens-Ford Glass Company (hereinafter LOF Glass). The 1946 agreement further provided that Canteen Service would assume Gladco's obligation to pay to the owners of the locations where Gladco vending machines were operated, but where no counter food was sold, an 8 percent commission on the gross sales of candy, gum, and nuts sold through vending *87 machines. It was provided, however, that Canteen Service would not be required to pay Gladco any commission on sales made through vending machines at such locations. [5]
Prior to 1958, Canteen Service had paid location commissions to Virgil on the LOF Glass business. In 1958, LOF Glass negotiated for location commissions to be paid directly to it by Canteen Service. Subsequently, Canteen Service, as the result of a waiver by Virgil and the Gladieux interests, neither paid nor accrued any further location commissions to Virgil or Gladco on the LOF Glass business until October 1, 1960, when such payments were again required pursuant to the sale-leaseback agreement between Canteen Service and Gladco, dated January 1, 1961. Beginning in 1953, Canteen Service paid location commissions to Toledo Scale. Although Canteen Service did not pay Virgil or Gladco additional location commissions, as a result of negotiations between *88 Virgil and Toledo Scale in 1955 or 1956, Toledo Scale thereafter remitted to Gladco approximately 85 percent of the commissions received by Toledo Scale from Canteen Service. Canteen Service, however, never paid or accrued location commissions directly to Gladco for vending machine sales at Toledo Scale until October 1, 1960, pursuant to the sale-leaseback agreement between Canteen Service and Gladco, dated January 31, 1961. The transfer of Gladco's vending operations to Canteen Service, pursuant to the agreement of May 10, 1946, appealed strongly to Virgil for financial reasons since, pursuant to Automatic's franchise arrangement under which Canteen Service was then operating, Canteen Service could lease its vending equipment from Automatic whereas up to that time Gladco was compelled to purchase such equipment, thereby limiting its financial resources for expansion. The agreement also appealed to Gladco inasmuch as it provided an option pursuant to which Gladco could purchase up to 75 percent of the stock in Canteen Service on or before October 31, 1946. In the event such option was exercised and in the further event Handwork or Gladco later wished to sell their respective stockholdings, *89 they were required to offer them to each other under a reciprocal right of first refusal. Gladco later exercised its right of purchase, and as a result of Canteen Service's subsequent redemption of Handwork's 25 percent stock interest in Canteen Service, Gladco became the sole owner of Canteen Service. After May 10, 1946, as vending machines were adapted to handle food products other than candy, gum, and nuts, such as milk, coffee, and ice cream, Virgil and Gladco exacted varying rates of location commissions from Canteen Service depending upon the relative profit margins of the foods being vended as well as the amount of location commissions Gladco was required to pay to its industrial clients. Thus, in time there arose an inconsistent pattern of location commissions payable to Gladco by Canteen Service. On or about December 4, 1953, Gladco began operating a restaurant and cafeteria at the plant and facilities of Toledo Scale Co. of Toledo, Ohio (hereinafter Toledo Scale) and continued such operations throughout Canteen Service's taxable year in question. Also, about December 4, 1953, Canteen Service was permitted to install canteens at nine different plant locations of Toledo *90 Scale. For a period occurring between 1953 and 1960, Gladco waived the location commissions payable to it by Canteen Service on the Toledo Scale business and did not again require commission payments to be made to it on that business until the sale-leaseback agreement entered into between it and Canteen Service on January 31, 1961, which agreement increased such commission payments retroactively to October 1, 1960. Gladco, during the years in question, operated various food systems, such as in-plant employee feeding concerns, cafeterias, snack bars, and dining rooms. During those years and until February 2, 1961, of the outstanding capital stock of Gladco, consisting of 500 no par common shares, 499 shares were owned by Virgil and the remaining share by his wife. On June 30, 1960, Virgil and his wife owned the entire outstanding capital stock of 15 corporations engaged in the merchandising and vending of food, beverages, cigarettes, and gum. Included among those 15 corporations were Canteen Service, Southeastern, and Gladco. Immediately prior to June 30, 1960, ABC Vending Corporation (whose name has since been changed to ABC Consolidated Corporation and hereinafter will be *91 referred to as ABC) was primarily engaged in the food and beverage merchandising and vending business with book net worth in excess $16of million and with annual sales from its vending business exceeding $60 million. At that time, ABC was a publicly owned corporation with stock listed on the New York Stock Exchange. In January of 1961, it had 8,522 shareholders who owned 1,228,328 shares of common stock. Additionally, it held 48,960 shares of treasury stock. Prior to February 2, 1961, neither Virgil nor his wife owned any capital stock of ABC. On June 30, 1960, ABC and Virgil entered into an agreement whereby Virgil agreed, among other things, to transfer to ABC all of the outstanding capital stock of the 15 corporations owned by him and his wife, in exchange for 80,000 shares of the capital common stock of ABC. The agreement provided that Virgil was to be retained by ABC in a "major managerial capacity" at an annual salary of $62,500 for 5 years, after which his salary would be increased to $67,500. The agreement further provided that ABC would deliver to Virgil a stock option certificate giving him the right to acquire 5,000 shares of ABC common stock at a price equal to 85 percent *92 of the market value of the stock on the New York Stock Exchange on the date of settlement of the foregoing agreement. Automatic, relying on the provisions of the franchise agreement which it had entered into with Canteen Service on July 1, 1947, refused to consent to Virgil's attempted transfer to ABC of the outstanding capital stock of Canteen Service and Southeastern. [6] Pursuant to a section of that agreement which defined the procedure for handling a dispute as to petitioners' right to transfer, Automatic's refusal to consent to the sale and transfer was submitted to arbitration. On December 27, 1960, the arbitration tribunal decided that the withholding of such consent by Automatic was not unreasonable, arbitrary, or capricious. Subsequent to the arbitration decision, Virgil and ABC executed a "Supplemental Agreement" on January 26, 1961, amending their agreement of June 30, 1960, by *93 eliminating from the 1960 agreement the requirement that Virgil transfer the outstanding stock of Canteen Service and Southeastern to ABC. The amendatory agreement also reduced the number of ABC shares to be delivered to Virgil from 80,000 to 68,500. Also, on January 26, 1961, Virgil, ABC, Canteen Service, Southeastern, and Gladco executed an agreement which provided that since Virgil was no longer able to transfer petitioners' stock to ABC, Gladco and petitioners would enter into an agreement which would provide, among other things, that: (1) petitioners would sell and transfer to Gladco their designated tangible physical assets in the following amounts: $184,659.85 as to Canteen Service and $5,109.43 as to Southeastern; [7] (2) Gladco would lease back to petitioners all such assets for a term of 20 years from October 1, 1960, with the further agreement that during that term Gladco would provide and lease to petitioners "all additional equipment necessary for the operation of the vending machine business" conducted by petitioners: [8] (3) petitioners would pay to Gladco for such leased assets a "rental" equal to 10 percent of the gross sales from the vending machine business "on and *94 after October 1, 1960, and until the end of the term of the said lease and any extended term thereof"; [9] (4) such "rentals" were not to be such in amount as would create a deficit in net income of either petitioner, net income being computed - before Federal income taxes and before any salaries or expenses paid to or attributable to Virgil A. Gladieux or any member of his family, * * * *95 (5) any income, loss, or expense of petitioners "derived from or attributable to marketable securities or any other investment not germane to the operation of the vending machine business" was to be excluded from the determination of such net income; (6) petitioners were to pay increased fixed location commissions to Gladco as of October 1, 1960, with respect to all sales at all vending locations derived through Virgil, Gladco, or any affiliated corporations; and (7) Gladco could, at its option, extend the lease provisions for four consecutive periods of 20 years each. An agreement, dated January 31, 1961, containing the foregoing provisions, was executed by Gladco with each petitioner. [10] On February 2, 1961, pursuant to the terms of the "Supplemental Agreement" between Virgil and ABC, ABC delivered 68,500 shares of its capital common stock to Virgil and his wife in the respective amounts of 54,200 and 14,300 shares. On that same day, Virgil and his wife transferred to ABC the outstanding shares of stock in 13 corporations wholly owned by them, constituting all of the corporations referred to in the agreement dated June 30, 1960, with the exception of Canteen Service and Southeastern. *96 The $184,659.85 received by Canteen Service under the January 31, 1961, agreement, together with an additional $201,827.30 of its other funds, was used by Canteen Service to purchase shares of ABC stock in the spring of 1961. Similarly, the $5,109.43 received by Southeastern under the January 31, 1961, agreement, together with an additional $52,863.64 of its other funds, was used by Southeastern to purchase ABC stock in the spring of 1961. [11] The total investment by petitioners of $444,460.22 in the spring of 1961 was used to purchase 11,500 shares of ABC stock. *97 During the negotiations between ABC and Virgil which were carried on both before and after the arbitration decision, Canteen Service was the owner of an 8 1/2-acre parcel of vacant land, purchased by it in 1959, and located in Toledo, Ohio. Efforts were then being made by Canteen Service to sell the property and on April 27, 1961, the property was sold for $75,000 resulting in a net gain to Canteen Service, after expenses of sale, of $33,238.50. This property was not included in the assets of Canteen Service sold to Gladco under the agreement dated January 31, 1961, and Gladco at no time held title to this property. For the fiscal year ended September 30, 1961, Canteen Service paid or accrued on its books as a liability in favor of Gladco, as purported rentals under the January 31, 1961, agreement, the sum of $121,172.15, including an amount of $28,897.95 with respect to the 8 1/2-acre parcel sold by Canteen Service on April 27, 1961. [12] Canteen Service subsequently deducted the purported rentals from its gross income for its fiscal year 1961. During the calendar years 1960 and 1961, Gladco included as rental income, in its taxable income, the amount of $121,172.15 so paid to *98 it or accrued as a liability in its favor by Canteen Service. Respondent allowed Canteen Service a rental deduction in the amount of $53,592.79 for the fiscal year ended September 30, 1961. The amount so allowed constituted the total depreciation, on a straight line method with various lives, charged off and deducted as an expense by Canteen Service for the fiscal year ended October 1, 1960, on the buildings, improvements, trucks, machinery, equipment, furniture, fixtures, and vending machines transferred by Canteen Service to Gladco pursuant to the agreement of January 31, 1961, thus disallowing as a deduction from the taxable income of Canteen Service $67,579.36 of such rentals so paid or accrued. During the fiscal year ended September 30, 1961, Southeastern paid or accrued on its books as a liability in favor of Gladco, as purported rentals under the January 31 1961, agreement, *99 the sum of $12,211.30. Southeastern subsequently deducted the purported rentals from its gross income for its fiscal year 1961. During the calendar years 1960 and 1961, Gladco included as rental income in its taxable income the amount of such rentals so paid to it or accrued as a liability in its favor by Southeastern during the fiscal year ended September 30, 1961. Respondent allowed Southeastern a rental deduction in the amount of $1,906.59, for the fiscal year ended September 30, 1961. The amount so allowed constituted the total depreciation, on a straight line method with various lives, charged off and deducted as an expense by Southeastern for the fiscal year ended October 1, 1960, on the trucks, furniture, fixtures, and vending machines assigned by Southeastern to Gladco pursuant to the agreement of January 31, 1961, thus disallowing as a deduction from the taxable income of Southeastern $10,304.71 of such rentals so paid or accrued. For the accounting periods ended October 29, 1960, November 26, 1960, December 24, 1960, January 22, 1961, and February 20, 1961, location commissions payable by Canteen Service to Gladco under their agreement of January 31, 1961, were retroactively *100 increased and accrued, from and after October 1, 1960, by journal entries made to the books of Canteen Service on March 18, 1961. On April 15, 1961, Canteen Service paid these accruals to Gladco. The foregoing location commissions, as well as the location commissions paid or accrued for the accounting periods of Canteen Service commencing February 21, 1961, and ended September 30, 1961, together with the portions thereof which were allowed and disallowed by the Commissioner were as follows: [13]
Location Commissions Paid or Accrued by Canteen Service to Gladco
Accounting Periods
Ended
Ended
Origin
October 29, 1960
of com-
November 26, 1960
January 22, 1961
missions
December 24, 1960
February 20, 1961
Dis-
Dis-
Allowed
allowed
Allowed
allowed
LOF Glass
$18,962.79
$10,107.40
Toledo Scale
2,280.44
1,451.31
All other
business
$13,541.09 [1]
3,043.45 [2]
$7,799.03 [1]
1,615.65 [2]
Total
$13,541.09
$24,286.68
$7,799.03
$13,174.36
Location Commissions Paid or Accrued by Canteen Service to Gladco
Total
Origin
of com-
February 21, 1961 to
Fiscal year ended
missions
September 30, 1961
September 30, 1961
Dis-
Dis-
Allowed
allowed
Allowed
allowed
LOF Glass
$31,038.92
$60,109.11
Toledo Scale
5,588.30
9,320.05
All other
business
$39,492.30 [3]
$60,832.42
4,659.10
Total
$39,492.30
$36,627.22
$60,832.42
$74,088.26
*101 *102 Location commissions in the amount of $74,088.26 which were paid or accrued by Canteen Service for the Fiscal year ended September 30, 1961, and which were disallowed by respondent as a deduction from the gross income of Canteen Service for Federal income tax purposes for said fiscal year, were included in the taxable income of the following corporations in the amounts and for the taxable years as follows: Included by Gladco in its 1960 Federal income tax return
$24,286.68
Included by Gladco in its 1961 Federal income tax return
44,213.28
Included by Buddies of Lucas County, Inc. (one of the
Gladco companies ac-
quired by ABC) in its 1961 Federal income tax return
5,588.30
Total
$74,088.26
For the accounting periods ended October 29, 1960, November 26, 1960, December 24, 1960, January 22, 1961, and February 20, 1961, location commissions payable by Southeastern to Gladco under their agreement of January 31, 1961, were retroactively increased and accrued, from and after October 1, 1960, by journal entries made to the books of Southeastern on March 18, 1961. The foregoing location commissions, as well as the location commissions paid or accrued for the accounting *103 periods of Southeastern commencing February 21, 1961, and ended September 30, 1961, together with the portions thereof which were allowed and disallowed by the Commissioner, are as follows: Location Commissions Paid or Accrued by Southeastern to Gladco
Accounting Periods
Total
Ended
Ended
Ended
October 29, 1960
October 29, 1960
November 26, 1960
November 26, 1960
January 22, 1961
February 21,
1961 to
December 24, 1960
December 24, 1960
February 20, 1961
September 30,
1961
Allowed
Disallowed
Allowed
Disallowed
Allowed
$1,138.63 [1]
$995.63 [2]
$825.89 [1]
$598.21 [2]
$5,616.21 [3]
Location Commissions Paid or Accrued by Southeastern to Gladco
Ended
October 29, 1960
November 26, 1960
February 21, 1961
Fiscal year ended
to
December 24, 1960
September 30, 1961
September 30, 1961
Allowed
Disallowed
Allowed
Disallowed
$1,138.63 [1]
$7,580.73
$1,593.84
*104 Location commissions in the amount of $1,593.84 which were paid or accrued by Southeastern for the fiscal year ended September 30, 1961, and which were disallowed by respondent as a deduction from the gross income of Southeastern for Federal income tax purposes for said fiscal year, were included in the taxable income of Gladco in its Federal income tax returns as follows: For the year 1960
$ 995.63
For the year 1961
598.21
Total
$1,593.84
Opinion Issue 1. Purported Rental Payments For the fiscal year ended September 30, 1961, Canteen Service and Southeastern claimed as a deduction for purported rental payments, the respective amounts of $121,172.15 and $12,211.30, constituting the amounts they paid Gladco under certain sale-leaseback agreements dated January 31, 1961. Respondent has determined that the amounts so claimed are excessive to the extent that they exceed $53,592.79 as to Canteen Service and $1,906.59 as to Southeastern. Petitioners' principal contention appears to be that since the contracts imposing the questioned rentals were the result of arm's length negotiation between unrelated parties having adverse interests, the claimed rental deductions *105 are not subject to attack by respondent as being unreasonable. Thus, it is argued that under the relevant statutory provision, section 162(a)(3) of the 1954 Code, [14] if the purported rentals were required to be paid pursuant to an arm's length agreement, the reasonableness of the rentals so paid cannot be judicially assailed. In considering a similar contention in Roland P. Place, 17 T.C. 199, 203 (1951), affd. 199 F. 2d 373 (C.A. 6, 1952), certiorari denied 334 U.S. 927 (1953), this Court stated: The basic question is not whether these sums claimed as a rental deduction were reasonable in amount but rather whether they were in fact rent instead of something else paid under the guise of rent. The inquiry is whether the petitioner was in fact and at law "required" to pay these sums as rent. * * * When there is a close relationship between lessor and lessee and in addition there is no arm's length dealing between them, an inquiry into what constitutes reasonable rental is necessary to determine whether the sum paid is in excess of what the lessee would have been required to pay had he dealt at arm's length with a stranger. * * * [15] Even though *106 petitioners' contention might be correct if the purported rentals at issue were in fact arrived at as the result of arm's length negotiation between adverse parties, it is incumbent upon this Court to determine in the first instance, whether such is in fact the case. In an attempt to support their position, that the sale-leaseback agreements were arrived at by arm's length negotiation between adverse parties, petitioners contend that those agreements arose out of negotiations between representatives of ABC, who, on the one hand, were representing Gladco, and Virgil, who, on the other hand, was representing petitioners. According to this theory, since ABC was to acquire Gladco from Virgil, ABC was interested in securing the best possible rental agreement for Gladco, whereas Virgil, being the owner of Canteen Service and Southeastern, was striving to - 1. maintain the close relationship which had theretofore existed between Gladieux Corporation and Petitioners, since Gladieux Corporation had generated more than seventy-five per cent (75%) of the vending business enjoyed by Petitioners, 2. assure the Petitioners against any operating loss as the result of the rental arrangement, and
*107 3. assure the Petitioners of the availability of funds for expansion, for acquisitions of other vending companies which he then had in mind and for the eventual purchase by Gladieux Corporation of the vending machines then being rented by the Petitioners from Automatic at no additional cost to Petitioners. While the foregoing objectives may have existed in Virgil's mind prior to the execution of *108 the sale-leaseback agreements, we are convinced, from a thorough consideration of the entire record, that such objectives were subservient to Virgil's principal objective of consummating a business deal with ABC along the lines established by their agreement of June 30, 1960. Thus, the true motivating force for the sale-leaseback agreements was a desire on the part of Virgil to transfer his interest in his food service companies in exchange for an executive position with ABC at a starting salary of $62,500, acquisition of 80,000 shares of ABC stock, and a stock option for an additional 5,000 shares of ABC stock at 85 percent of market value. However, when Automatic, who was petitioners' franchisor as well as a competitor of ABC, objected to the transfer of petitioners' stock to ABC, and that objection was upheld by an arbitration award, it became necessary for Virgil to devise an alternative plan for accomplishing the same results without transferring petitioners' stock to ABC. As shown by the record, Virgil and ABC agreed to a plan whereby Virgil would transfer ownership in 13 of his 15 companies to ABC, and funnel the profits of the remaining 2 companies, Canteen Service and Southeastern, *109 into Gladco by way of the sale-leaseback agreements. While that plan did not secure to ABC the ownership of all 15 of Virgil's food service companies as ABC originally desired, the effect of the several agreements between the parties accomplished much the same thing inasmuch as ABC acquired stock ownership in 13 of the 15 companies and received, under the provisions of the sale-leaseback agreements, virtually all the profits of Canteen Service and Southeastern. Virgil, on the other hand, obtained his executive position with ABC, received 68,500 shares of ABC stock, and acquired the option to purchase 5,000 additional shares of ABC stock at 85 percent of market value. Shortly after the foregoing results were accomplished, Virgil caused petitioners to collectively purchase 11,500 shares of ABC stock, thereby securing to himself, directly and through his ownership of petitioners, the 80,000 shares of ABC stock originally contemplated by the June 30, 1960, agreement between himself and ABC. The dominant motives of both Virgil and ABC throughout the negotiations which culminated in the sale-leaseback agreements are crystal clear. Virgil sought to obtain ABC stock and an executive position *110 with the company and ABC sought to acquire Virgil's 15 food service companies. In light of these facts, we think it abundantly clear that the sale-leaseback agreements were designed solely to fulfill the personal objectives of Virgil. There was no legitimate business purpose for petitioners to undertake the sale and subsequent leaseback of their tangible assets other than to satisfy Virgil's purpose of shifting income from petitioners to Gladco in order to induce ABC to go through with the deal. Thus, this is not a case where a corporation entered a sale-leaseback arrangement in order to generate needed cash for business expansion. To the contrary, all the money received by petitioners upon the sale of their tangible assets, together with substantial additional amounts, was used to purchase ABC stock, thus serving no meaningful business purpose to petitioners. Petitioners' position is further weakened by the fact that during the entire negotiations leading up to the execution of the sale-leaseback agreements, the owner of both the lessor (Gladco) and the lessees (petitioners) was the same person, Virgil Gladieux. Petitioners' attempt to transform such an identity of interest into *111 a relationship which petitioners characterize as adverse, transgresses reasonable imagination. All the more so since the facts show that the sale-leaseback agreements were not intended to be ends in themselves but merely steps in an integrated plan to secure to Virgil and ABC advantages which could not benefit petitioners in any meaningful way. From a review of all the facts bearing on this issue, which have been set out at length in our findings, we are convinced that the sale-leaseback agreements in question were not the result of arm's length negotiation between adverse parties and, therefore, we must determine whether the purported rentals were "in excess of what the [lessees] would have been required to pay had * * * [they] dealt at arm's length with a stranger." Roland P. Place, supra. The terms of the sale-leaseback agreements provided that petitioners were to make purported rental payments to Gladco equal to 10 percent of petitioners' gross sales on and after October 1, 1960, derived from their vending machine business. The agreements provided, however, that if for any annual fiscal period any rent payable to Gladco would result in a deficit to petitioners' *112 net income, then such rental would be "abated or refunded in such amount as to eliminate such deficit." The contract provided that net income, as used to calculate the existence of a deficit, was to be determined - before Federal income taxes and before any salaries or expenses paid to or attributable to Virgil A. Gladieux or any member of his family, and excluding from the determination of such net income any income, loss or expense of * * * [petitioner] from or attributable to marketable securities or any other investment not germane to the operation of the vending machine business of * * * [petitioner]. For the fiscal year ended September 30, 1961, 10 percent of Canteen Service's sales amounted to $165,149.03 and 10 percent of Southeastern's sales amounted to $17,006.69. Inasmuch as the payment of such "rental" would have resulted in a deficit to petitioners' net operating income for that year, the rentals payable to Gladco under the provisions of the January 31, 1961, contract were reduced as to Canteen Service and Southeastern, to $121,172.15 and $12,211.30, respectively. The foregoing amounts were subsequently claimed by petitioners as rental deductions in their tax returns *113 for their fiscal year 1961. As to the claimed deductions for the period commencing October 1, 1960, and ended January 31, 1961, we fail to perceive how the amounts paid during that period could satisfy the statutory requirements of section 162(a)(3). That provision specifically provides that to constitute a deductible expense, the payment must be - required * * * as a condition to the continued use or possession * * * of property to which the taxpayer has not taken or is not taking title or in which he has no equity. [Emphasis supplied.] The sale-leaseback agreements were not executed before January 31, 1961. The language employed in those agreements in no way suggests that petitioners were attempting to sell their tangible assets to Gladco as of October 1, 1960. To the contrary, the opening paragraph of the respective agreements states that petitioner "hereby sells, transfers and assigns to Gladieux Corporation," thereby evidencing an intent on petitioners' part to make a present sale of their assets on January 31, 1961. While it is true that the agreements subsequently recite that Gladco "hereby leases" to petitioners the aforementioned tangible assets "for a term of twenty *114 years from October 1, 1960," the retroactive aspect of this lease provision can in no way convert ownership of petitioners' assets to Gladco. It follows, that petitioners had not parted with title to their tangible assets, at least until the execution of the sale-leaseback agreements on or after January 31, 1961. That being the case, the retroactive payments made by petitioners to Gladco for the 4-month period from October 1, 1960, to January 31, 1961, was for property which petitioners owned. Such payments are therefore not deductible as rentals under the explicit language of section 162(a)(3) of the Code. The fact that payments were designated as "rentals" and Gladco may have had an enforceable contract right against petitioners for the amounts so designated, in no way alters this result. As we stated in Catherine G. Armston, 12 T.C. 539, 548 (1949), affd. 188 F. 2d 531 (C.A. 5, 1951): the mere designation of * * * amounts as rental does not legally characterize them as such. Nor does the fact that as between the * * * [lessor and lessees], the parties to the agreement, the obligation to pay may have been enforceable, render the payment deductible as *115 rent or otherwise * * *
Equally objectionable is Canteen Service's inclusion in its claimed rental deduction of the amount of $28,897.95 which constitutes part of the profits realized by Canteen Service upon the sale of an 8 1/2-acre vacant lot on April 27, 1961. Although Canteen Service paid or accrued this amount on its books as a liability in favor of Gladco, as purported rental under the sale-leaseback agreement, the facts as well as the applicable Code provision fail to support petitioners' treatment of this item as a "rental" deduction. The sale-leaseback agreement provided that the "rental" payment would be equal to 10 percent of Canteen Service's gross sales from its vending machine business, with the further provision that the annual "rental" would not be permitted to cause a deficit in Canteen Service's "net income." The agreement further provided that "net income," as used in the rental formula, would exclude income "derived from or attributable to marketable securities or any other investment not germane to the operation of the vending machine business of Canteen [Service]." Since the foregoing contract provisions were in effect at the time the land in question *116 was sold, the profits derived from its sale could not have been included in Canteen Service's net income for purposes of calculating its "rental" liability to Gladco without violating the express provisions of the sale-leaseback agreement. The fact that the profits so derived were included in Canteen Service's net operating income for purposes of calculating the "rental" payment, lends additional support to the fact that the series of transactions entered into among petitioners, Gladco, ABC, and Virgil in January 1961 were intended to shift virtually all of petitioners' income to Gladco rather than to serve any legitimate business purpose of petitioners. However, an additional and more serious objection arises with regard to petitioners' treatment of the real estate profits as "rental." Section 162(a)(3) of the Code specifically excludes as rental deductions, amounts paid for the use of property where title remains in the taxpayer-lessee. Since we have previously found that the land in question was never sold to Gladco by Canteen Service, and that Gladco at no time held title to such property, any "rental" payments made to Gladco by Canteen Service with respect to profits derived from *117 the sale of that land could not satisfy the relevant statutory provision. Thus, as to the purported rentals paid on the profits derived from the sale of Canteen Service's vacant land, we hold that respondent's disallowance was proper. In determining the reasonableness of the remaining amounts claimed by petitioners as rental deductions for the fiscal year 1961, one factor which we deem significant is the gross disparity between the price Gladco paid petitioners for their tangible assets and the purported rentals petitioners were required to pay Gladco in fiscal 1961 in order to lease back those same assets. In 1961 Canteen Service transferred its office, warehouse, trucks, cars, furniture, fixtures, vending machines, and related hardware to Gladco for $184,659.85, and yet was required to pay a purported rental of $121,172.15 in order to lease back those same assets for 8 months. For the same year, Southeastern similarly transferred its car, trucks, furniture, fixtures, vending machines, and related hardware to Gladco for $5,109.43, and was required to pay a purported rental of $12,211.30 in order to lease back those same assets for 8 months. It is evident that the payments made by *118 petitioners in 1961 as "rentals" were patently excessive and bore no reasonable relationship to an amount which would be required to be paid as rentals for such assets if the petitioners had dealt with a lessor at arm's length. Limericks, Inc., 7 T.C. 1129 (1946), affd. 165 F. 2d 483 (C.A. 5, 1948). Petitioners contend, however, that since the sale-leaseback agreements further required Gladco to "provide and lease to * * * [petitioners] all additional equipment reasonably necessary," the purported rentals were not unreasonable. Under the contract provision relied upon, the determination of how much, if any, additional equipment "was reasonably necessary" was apparently a judgment which Gladco alone would make. The record discloses that for the period October 1, 1960, through October 3, 1964, Southeastern paid Gladco total "rentals" of $62,487.98, receiving in return, for the period October 1, 1960, through December 27, 1964, "additional equipment" costing Gladco $12,097.91. For the same periods, Canteen Service paid Gladco total "rentals" of $432,835.18, receiving in return "additional equipment" costing Gladco $595,591.12. Thus, Southeastern paid Gladco *119 $62,487.98 to "lease" equipment valued by the parties at $5,109.48 and $12,097.91, for a total amount of $17,207.34. Similarly Canteen Service paid Gladco $432,835.18 to "lease" equipment valued by the parties at $184,659.85 and $595,591.12, or a total of $780,250.97. With regard to Canteen Service, an even greater disparity occurred for the period October 1, 1960, through approximately December 1962. During that period Gladco leased to Canteen Service former assets valued at $184,659.85 plus additional assets costing Gladco $66,537.18, or total assets of $251,197.03. As of September 29, 1962, Canteen Service had paid Gladco $208,176.58 in rentals. The unreasonableness of such rentals is striking. The amounts paid by petitioners were almost sufficient to purchase outright the assets "leased." Considering the gross disparity existing between the value of the properties rented to petitioners and "rentals" obtained by Gladco under the sale-leaseback agreements, we must reject petitioners' contention that Gladco's obligation to provide "all additional equipment reasonably necessary" for petitioners' vending machine operations justified their otherwise excessive "rentals." We have carefully *120 considered the many alternative contentions presented by the parties respecting the rental issue and are satisfied that they do not alter our conclusion that the purported rentals paid by petitioners to Gladco for their fiscal year ended September 30, 1961, were grossly excessive, did not represent the fair rental value of the assets leased, and would not have been "required" to be paid by petitioners had they negotiated at arm's length with an adverse party. Having so concluded, we must hold that the amount respondent determined to be the maximum petitioners would have been required to pay must stand, since it has not been shown to be patently inadequate. Roland P. Place, supra.
Issue 2. Location Commissions During their fiscal year 1961, Canteen Service and Southeastern paid or accrued total location commissions of $163,468.56 and $11,221.38, respectively. Of those amounts Canteen Service paid or accrued to Gladco $134,920.68 and Southeastern paid or accrued to Gladco $9,174.57. Of the amounts paid or accrued to Gladco by petitioners, respondent disallowed $74,088.26 as to Canteen Service and $1,593.84 as to Southeastern. The $74,088.26 disallowed Canteen Service *121 consists of two components, location commissions paid or accrued to Gladco for sales at LOF Glass and Toledo Scale, and location commissions paid or accrued to Gladco for "all other business." The amount of the disallowances attributable to the LOF Glass and Toledo Scale business was $69,429.16, which constituted the entire location commissions claimed by Canteen Service as to those customers. The remaining amount disallowed, $4,659.10, constituted the excess in location commissions for Canteen Service's accounting periods beginning October 1, 1960, and ending February 20, 1961, on all Canteen Service's other business as computed under the rates set forth in the January 31, 1961, agreement between Canteen Service and Gladco, over the rates in effect under the May 10, 1946, agreement. [16] The $1,593.84 disallowed Southeastern constituted the excess in location commissions, for its entire 1961 fiscal year, as computed under the rates set forth in the January 31, 1961, agreement between Southeastern and Gladco, over the rates in effect prior to that agreement. *122 Respondent has thus disallowed location commissions which fall into two categories. The first category is composed of the disallowance of all location commissions paid or accrued to Gladco by Canteen Service for sales at Toledo Scale and LOF Glass, for Canteen Service's 1961 fiscal year. The second category covers a partial disallowance of location commissions paid or accrued on Canteen Service's business, other than LOF Glass and Toledo Scale, and all of Southeastern's business, for the period October 1, 1960, through February 20, 1961. The basic issue is whether that portion of the location commissions paid or accrued by petitioners in their fiscal year 1961, and which has been disallowed by respondent, constituted "ordinary and necessary expenses" to petitioners under section 162(a) of the Code. Petitioners contend, and respondent appears to concede, that the statutory requirement of "ordinary and necessary" is satisfied provided the claimed deduction is for an expense which is merely "appropriate and helpful" to the development of the taxpayer's business, citing the case of Commissioner v. Tellier, 383 U.S. 687 (1966). In applying such a standard to the instant *123 case, it has been necessary to consider a multitude of facts, many of which have been contested by the parties, in an attempt to reconstruct a meaningful fact pattern. After careful consideration of all the relevant facts bearing on this issue, as well as the numerous arguments presented by both parties, we are of the view that respondent's disallowance of petitioners' location commissions must be sustained. With respect to the disallowance of Canteen Service's commission payments to Gladco for sales at LOF Glass and Toledo Scale, we are convinced that such payments satisfied no meaningful business purpose of Canteen Service, but rather, constituted only a further effort on the part of Virgil Gladieux to transfer virtually all petitioners' income to Gladco and thereby secure to himself an executive position with ABC at a starting salary of $62,500, as well as to acquire 80,000 shares of ABC stock. Petitioners contend that the location commissioners paid to Gladco by Canteen Service for the year in question arose out of a contractual obligation between Canteen Service and Gladco which was negotiated at arm's length in 1946, and was rewritten in 1961 in order to standardize the rate *124 structure on Canteen Service's business, a change allegedly made necessary by the increased number of foods used in Canteen Service's vending machines as well as the different location commission rates prevailing in different geographical areas for the same foods. We do not question that the 1946 agreement between Canteen Service and Gladco was negotiated at arm's length between adverse parties. At that time Gladco was owned equally by Virgil and his brother Nelson, and Canteen Service was owned by an unrelated party, Ben Handwork. The weakness in petitioners' contention, however, is that all location commissions in question arose out of the 1961 agreement, not the agreement of 1946, and as we have already determined under issue 1, supra, the 1961 agreement was entered into between corporations wholly owned by Virgil and his wife, for the principal purpose of shifting income from petitioners to Gladco and not for any meaningful business purpose as far as petitioners were concerned. This conclusion is further supported by the fact that prior to the 1961 agreement, imposing increased location commissions on petitioners retroactively to October 1, 1960, Gladco had waived all commission *125 payments due from Canteen Service on the LOF Glass and Toledo Scale business. The waivers as to those commission payments occurred at the time Canteen Service began making location commission payments directly to the industrial clients, LOF Glass and Toledo Scale. Thus, for several years prior to the 1961 agreement, Canteen Service was not required to make any location commission payments to Gladco on its LOF Glass and Toledo Scale business. However, in order for Virgil's deal with ABC to be consummated, it became necessary to shift all income of petitioners to Gladco. To accomplish this objective Canteen Service was required to reinstitute location commission payments to Gladco on its LOF Glass and Toledo Scale business, which was, of course, in addition to the amounts Canteen Service was required to pay Gladco as purported rental payments. We can find no reasonable explanation for reinstituting such location commissions except as a further device to accomplish the shifting of all petitioners' income to Gladco. The record specifically shows that at the time Virgil was negotiating with representatives of ABC, he felt ABC was intending to acquire, by the various agreements, all the *126 operating income of petitioners. Even more objectionable to allowing Canteen Service's location commissions in question is the fact that not only prior to, but for the year in question, Canteen Service paid location commissions directly to LOF Glass and Toledo Scale for the right to operate vending machines on the premises of those industrial customers. In 1961, Canteen Service paid to those customers the combined amount of $12,401.70 in location commissions. In spite of this, petitioners contend that they are entitled to deduct the further amount of $69,429.16 paid to Gladco as location commissions for vending machine sales on the premises of the same two customers. The record fails to reflect any business or economic need for Canteen Service to make the location commission payments in question, and in light of the fact that Canteen Service was already making payments directly to LOF Glass and Toledo Scale, we know of none. Lacking in any meaningful business purpose we fail to see how the payment of such obviously unnecessary amounts could be "appropriate and helpful" for the development of Canteen Service's business. Accordingly we hold that as to the location commissions paid *127 by Canteen Service to Gladco on the sales at LOF Glass and Toledo Scale for the year in question, petitioners are not entitled to a business expense deduction under section 162(a). There remains for our determination the correctness of respondent's partial disallowance with respect to location commissions made by Canteen Service to Gladco on sales other than at LOF Glass and Toledo Scale, for the period October 1, 1960, through February 20, 1961, and with respect to location commissions made by Southeastern to Gladco for the same period. [17] Respondent has disallowed only so much of the foregoing location commissions as exceeded the commissions computed pursuant to the rates in effect under the agreement between Canteen Service and Gladco, dated May 10, 1946. Thus, for the period October 1, 1960, through February 20, 1961, respondent disallowed only $4,659.10 out of $25,999.22 claimed by Canteen Service and disallowed $1,593.84 out of 4,558.36 claimed by Southeastern. Since respondent has allowed petitioners' claimed location commissions, although at the lower rates in effect prior to the 1961 agreements, the only question presented is whether respondent correctly disallowed the *128 retroactive increases required by the 1961 agreements. Petitioners contend that the location commissions were made retroactive to October 1, 1960, because that was the date, originally contemplated by ABC and Virgil in their agreement of June 30, 1960, when the exchange of Virgil's 15 companies was to be made in return for ABC stock. This fact is apparently relied upon by petitioners to justify making the commission payments retroactive to October 1, 1960. Even conceding that the October 1 date was set for that purpose, which the record does not necessarily support, we think petitioners' position is irrelevant with regard to the payment of location commissions by Canteen Service and Southeastern inasmuch as the limited question for our determination is whether the retroactive payments constituted ordinary and necessary business expenses to petitioners. Thus, *129 while the October 1 date may have been required in order for Virgil to consummate his deal with ABC, we find no valid business reason in the record for petitioners to retroactively pay increased location commissions for more than 4 months. The record is devoid of any meaningful economic benefit flowing to petitioners for such payments, and consistent with our prior determination, supra, we think the retroactively increased rates imposed upon petitioners under their 1961 agreements with Gladco merely constituted a necessary concession on Virgil's part, in order to consummate his personal deal with ABC, irrespective of whether such a result proved "appropriate and helpful" for the development of petitioners' business. Accordingly we sustain, under section 162(a), respondent's disallowance of that portion of petitioners' claimed location commissions computed under the retroactive provisions of their 1961 agreements with Gladco. Issue 3. Surtax Exemptions Respondent has determined that Southeastern was not entitled to a surtax exemption for its fiscal years ended October 3, 1959, October 1, 1960, and September 30, 1961. In his deficiency notice, dated June 19, 1964, respondent assigned *130 as his reason for such disallowance, the following: In your income tax returns for the above taxable years, you claimed a surtax exemption. It is held that pursuant to Section 1551 and/or Section 269 of the Internal Revenue Code of 1954, no such surtax exemption is allowable. Section 1551 of the Code [18] provides, in pertinent part, that if a corporation transfers all or part of its property (other than money) to another corporation which was either created for the purpose of acquiring such property or was not actively engaged in business at the time of such acquisition, and after such transfer the transferor corporation or its stockholders are in control of the transferee corporation, then the transferee corporation shall not be allowed the $25,000 surtax exemption unless it establishes by a clear preponderance of the evidence that the securing of such exemption was not a major purpose of the transfer. In order that Southeastern's surtax exemption be denied under section 1551, respondent recognizes that there must have been a "transfer of property" from another corporation to Southeastern at the time of its incorporation. Respondent contends that consistent *131 with the statutory requirement under section 1551, Canteen Service transferred its eight "Canteen" locations at the Revco Manufacturing Co., in Deerfield, Michigan, to Southeastern at a time when Southeastern was not yet actively engaged in business. *132 While it is true that Southeastern, upon its incorporation in 1956, began operating the eight "Canteens" formerly operated by Canteen Service, that fact does not satisfy the statutory transfer requirement inasmuch as there has been no showing that the "Canteens" transferred to Southeastern were in any way owned by Canteen Service. To the contrary, Automatic owned the vending equipment used at the Revco locations and through its franchise, Automatic determined who would operate such "Canteens." The record clearly reflects the fact that Southeastern operated the "Canteens" at Revco under such a franchise agreement with Automatic. In light of this fact we do not think Canteen Service ever possessed such a property right in the eight "Canteens" which could have been the subject of transfer to Southeastern. That being the case, the transfer requirement of section 1551 has not been met and Southeastern may not be denied its surtax exemption under that statutory provision. Respondent contends, however, that Southeastern's surtax exemption should also be denied under section 269 of the Code. [19] The pertinent provisions of that section provide that where any person or persons acquire control *133 of a corporation for the "principal purpose" of evading or avoiding Federal income tax by securing the benefit of a deduction or other allowance which such person would not otherwise enjoy, the Secretary may disallow such deduction or other allowance. Upon a consideration of the entire record, we think the facts require us to hold that Southeastern was incorporated in 1956 for the principal purpose of avoiding Federal income taxes, although in arriving at our determination we recognize that the creation of Southeastern may also have served legitimate business purposes. *134 In an attempt to convince us that tax avoidance was not the principal purpose of incorporating Southeastern, petitioners rely heavily on Virgil's self-serving testimony which was to the effect that his company's projected expansion into Michigan required the creation of a "local identity" or "Michigan image." We are asked to accord great weight to this conclusion because of the fact that Virgil "has been experienced and successful in business." While the successful expansion of Virgil's vending business in Michigan may have necessitated the use of a "Michigan" corporation, the record does not support such a conclusion. In 1953 Canteen Service, an Ohio corporation, qualified to do business in Michigan and received authorization from Automatic to operate "Canteens" at Revco's plant in Deerfield, Michigan. Canteen Service continued to operate those "Canteens" until Southeastern began its Michigan operations in 1956. Virgil's testimony, as well as petitioners' briefs, goes to great length to show that after Southeastern began its operations it established headquarters in Michigan, hired two men residing in Michigan to supervise its operations, opened bank accounts in Michigan, and *135 established warehouse and refrigeration facilities in Michigan. While we do not question these facts, the weakness in petitioners' position is that there is no reason shown, and we know of none, which would have forbidden Canteen Service from adopting the same Michigan contacts. Of additional significance is the fact that although Virgil's testimony stressed the importance of a Michigan image, the franchise agreement under which Southeastern obtained virtually all its vending machines, specifically prohibited Southeastern from using its name on the vending machines in a manner which would give the appearance that Southeastern was the owner of the machines. Thus, at the time of Southeastern's incorporation, both Canteen Service and Southeastern were owned by the same individuals (Virgil and Handwork) in the same percentages (75 and 25, respectively); Southeastern took over virtually the same Michigan business that Canteen Service gave up; both businesses were based upon a franchise with Automatic which provided the necessary "Canteens" for an agreed rental; both corporations were on the 13-period system of tabulating income and expenses, using the same fiscal year; and both corporations *136 used the same street address in Toledo, Ohio, to designate their corporate address on their Federal income tax returns. It is in no way apparent from the record why Canteen Service could not have continued to operate and expand the Michigan business. Virgil's conclusory statement regarding the need for a Michigan image finds no support in the record. Considering his business experience and success, as vouched for by petitioners and revealed by the number and extent of his food service corporations, we think it a fair assumption that he was well aware of the Federal income tax advantages to be gained by the addition of yet another corporation to his already extensive operations. Considering the totality of facts bearing upon this issue, we are satisfied that petitioners have failed to show that the acquisition of an additional surtax exemption was not the "principal purpose" of incorporating Southeastern in 1956. Accordingly we must sustain respondent's disallowance of Southeastern's surtax exemption for the years at issue, pursuant to section 269 of the Code. Decisions will be entered for the respondent. Footnotes
1. All statutory references hereinafter are to the Internal Revenue Code of 1954.↩
2. Under the franchise and lease agreement, a "Canteen" was defined as a candy, gum, nut, or other vending machine, although that word will sometimes be used hereinafter to designate more than one such machine at a given location. ↩
3. The additional revenue reported on its tax return was attributable to vending machines owned outright by Canteen Service.↩
4. Gladieux Corporation's predecessor business was incorporated in 1931 under the name of Buddies Box Lunch, Inc. It was only after three corporate name changes that the name of the business became Gladieux Corporation on November 2, 1960. To avoid confusion, use of the name Gladco will be used to refer to the same business, both before and after its name became Gladieux Corporation.↩
5. While Southeastern never entered into any written agreement respecting payment of location commissions to Gladco, it followed the same pattern of paying such commissions on vending business generated by Gladco's in-plant feeding business as did Canteen Service.↩
6. The franchise agreement provided that petitioner could not, without the consent of Automatic, sell, assign, or transfer any interest in the agreement. It further provided that Automatic would not "unreasonably, arbitrarily or capriciously" withhold its consent to such a sale, assignment, or transfer.↩
7. The amount Gladco agreed to pay petitioners for their tangible physical assets constituted their net book value, after accrued depreciation as shown on petitioners' books as of October 1, 1960. Included in such assets transferred were 299 vending machines owned by Canteen Service and 4 vending machines owned by Southeastern. Journal entries reflecting the sale were posted on the books of Gladco and each petitioner on February 18, 1961. ↩
8. For the period October 1, 1960, through December 27, 1964, Gladco purchased "additional equipment" for lease to petitioners in the following amounts: As to Canteen Service, $595,591.12, and as to Southeastern, $12,097.91. For the period October 1, 1960, through December 1962, "additional equipment" in the amount of $66,537.18 was purchased for Canteen Service. ↩
9. For the period October 1, 1960, through October 3, 1964, petitioners made "rental" payments to Gladco in the following amounts: Canteen Service, $432,835.18 and Southeastern, $62,487.98. For the period October 1, 1960, through September 1962, Canteen Service made "rental" payments to Gladco totaling $208,176.58.↩
10. During the negotiations between ABC and Virgil in the latter part of 1960 and early part of 1961, which culmniated in the January 1961 agreements, Virgil was of the view that the representatives of ABC contemplated that the sale-leaseback arrangements provided for in those agreements would take most of petitioners' profits. As anticipated, the leaseback arrangements absorbed all of the profits, with the exception of dividends from petitioners' ABC stock, of Canteen Service for its 1961 through 1963 fiscal years, and Southeastern for its 1961 through 1964 fiscal years.↩
11. Although the January 31, 1961, agreement between Gladco and each petitioner provided that Gladco would deliver to each petitioner its promissory note in the amount of the respective purchase price, the journal entries on the books of Canteen Service and Southeastern, recording the sale of assets to Gladco, recited that Gladco "gave a note to ABC Vending Corporation for * * * [stated dollar amount] and we received check from ABC Vending Corporation."↩
12. During the negotiations between Virgil and representatives of ABC leading to the agreements of January 1961, it was agreed that the profit from the sale of this land would be included in the operating income of Canteen Service for the purpose of computing "rentals" under the contemplated contracts.↩
13. In addition to location commissions paid or accrued to Gladco by Canteen Service for its fiscal year 1961, Canteen Service also paid such commissions directly to LOF Glass in the amount of $8,656.76 and to Toledo Scale in the amount of $3,744.94.↩
1. The location commissions allowed on "All other business" were determined under rates in effect prior to the January 31, 1961, agreement between Canteen Service and Gladco. The commissioner further allowed as a deduction the amount of $28,547.88, which constituted all location commissions paid or accrued by Canteen Service during the fiscal year ended September 30, 1961, with respect to all those locations which were not subject to the provisions of the agreement of January 31, 1961. ↩
2. The location commissions disallowed on "All other business" were the excess of the commissions, as computed under the rates set forth in Schedule II of the January 31, 1961, agreement between Canteen Service and Gladco, over the rates in effect prior to the agreement of January 31, 1961. ↩
3. These location commissions were determined under the increased rate structure established in Schedule II of the January 31, 1961, agreement between Canteen Service and Gladco. ↩
1. The location commissions allowed were determined under rates in effect prior to the January 31, 1961, agreement between Southeastern and Gladco. The Commissioner further allowed as a deduction the amount of $2,046.81, which constituted all location commissions paid or accrued by Southeastern during the fiscal year ended September 30, 1961, with respect to all those locations which were not subject to the provisions of the agreement of January 31, 1961. ↩
2. The location commissions disallowed were the excess of the commissions, as computed under the rates set forth in Schedule II of the January 31, 1961, agreement between Southeastern and Gladco, over the rates in effect prior to the agreement of January 31, 1961. ↩
3. These location commissions were determined under the increased rate structure established by Schedule II of the January 31, 1961, agreement between Southeastern and Gladco.↩
14. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
15. To the same effect, see J. J. Kirk, Inc., 34 T.C. 130 (1960), affd. per curiam, 289 F. 2d 935 (C.A. 6, 1961); Southern Ford Tractor Corporation, 29 T.C. 833 (1958); and E-Z Sew Enterprises, Inc. v. United States, 260 F. Supp. 100↩ (E.D. Mich. 1966).
16. Respondent allowed all location commissions claimed on this latter component, "all other business," for the remainder of Canteen Service's fiscal year, February 21, 1961, through September 30, 1961.↩
17. Except for Canteen Service's commission payments computed upon sales to LOF Glass and Toledo Scale, respondent allowed all location commissions claimed by petitioners for the period February 21, 1961, through September 30, 1961, at the increased rates contained in the 1961 agreements between petitioners and Gladco.↩
18. SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT. If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) or the $100,000 accumulated earnings credit provided in paragraph (2) or (3) of section 535(c), unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. In determining the ownership of stock for the purpose of this section, the ownership of stock shall be determined in accordance with the provisions of section 544, except that constructive ownership under section 544(a)(2) shall be determined only with respect to the individual's spouse and minor children. The provisions of section 269(b)↩, and the authority of the Secretary under such section, shall, to the extent not inconsistent with the provisions of this section, be applicable to this section.
19. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly, or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. (b) Power of Secretary or His Delegate To Allow Deduction, Etc., in Part. - In any case to which subsection (a) applies the Secretary or his delegate is authorized - (1) to allow as a deduction, credit, or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or (2) to distribute, apportion, or allocate gross income, and distribute, apportion, or allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determines will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or (3) to exercise his powers in part under paragraph (1) and in part under paragraph (2).↩